Lewis F. BOYER, Jr., Thornton D. Hooper, Edward Burritt and Horace L. Pugh, Owners of Barge THE INTERSTATE NO. 8, Libellants,

v.

HOLLAND–AMERICAN LINE and THE BLYDENDYK, Respondents,

Lewis F. Boyer, Jr., Thornton D. Hooper, Edward Burritt and Horace L. Pugh, individually and as co-owners of THE Tug ELIZABETH S. HOOPER, Impleaded Respondents.

No. 75 of 1955.

United States District Court E. D. Pennsylvania.

Aug. 7, 1959.

EGAN, District Judge.

The libellants, Lewis F. Boyer, Jr., Thornton D. Hooper, Edward Burritt and Horace L. Pugh, owners of the barge Interstate No. 8, brought this suit by reason of a collision in the Chesapeake and Delaware Canal (hereinafter referred to as the C & D Canal) on June 10, 1954, between the barge Interstate No. 8 and the S.S. Blydendyk, owned by the Holland-American Line.[1] Thereafter, by an Order of the Court allowed under Admiralty Rule 56, 28 U.S.C.A. p. 119, respondent, Holland-American Line, impleaded Lewis F. Boyer, Jr., Thornton D. Hooper, Edward Burritt and Horace L. Pugh, individually and as co-owners of the tug Elizabeth S. Hooper. The respondent-claimant contends that the tug Elizabeth S. Hooper, which had the barge Interstate No. 8 in tow, was solely responsible for the collision between the barge and the S.S. Blydendyk.

The Court has jurisdiction over the parties and the subject matter by virtue of the Court's general admiralty and maritime jurisdiction.

1. Respondents' answer indicates that the owner of the S.S. Blydendyk is the Nederlandsch-Amerikaansche Stoomvaart Maatschappij, erroneously designed as Holland-American Line in the caption. Respondents waived this by entering a general appearance.

The issues between the respective parties having been joined, their causes were tried to the Court without a jury.

For reasons of convenience and clarity, the collective parties libellant and respondent shall be referred to as libellant and respondent, respectively, unless otherwise indicated.

Let us begin our analysis of this case by briefly stating certain facts which are not in dispute.[2]

1. The barge Interstate No. 8 is a steel oil barge, 190'7" in length, with a beam of 40'7", drawing, at the time of the collision, 2' forward and 3' aft. This barge was without means of steering or propulsion.

2. The tug Elizabeth S. Hooper is a diesel propelled craft approximately 83' long and 22' in width. Her draft, at all material times, was 10'6".

3. The S.S. Blydendyk is a "liberty type" dry cargo vessel with dimensions of approximately 450' in length and 55' in width, drawing 12'6" forward and 18' aft.

4. At the point of collision and in the immediate vicinity thereof, the C & D Canal is 250' in width and 27' to 28' in depth.

5. At all material times the weather was clear, visibility good, wind negligible and the tide or current in the C & D Canal was running toward the east at a force estimated from 1½ to 2½ knots per hour.

6. Both vessels carried the prescribed lights for night travel.

On the morning of June 10, 1954, at or about 4:05 A.M., the tug Elizabeth S. Hooper was in transit through the C & D Canal in an eastwardly direction, approaching Chesapeake City from the west, with the barge Interstate No. 8 in tow. At about this time, a freighter, identified as the Suzanne[3] crowded the tug and tow to the south bank of the C & D Canal, causing the barge to go aground and the towing lines to part.

At or about 4:02 A.M. of the same day, the S.S. Blydendyk, while in transit westwardly through the C & D Canal, was off Bethel, approaching Chesapeake City from the east and preparing to change pilots.

There is a great divergence in the evidence. The claims of the parties are not only conflicting but directly contradictory. Fortunately certain testimony that was produced serves as a beacon leading to a solution of the issues here involved.

Libellant contends that when the barge Interstate No. 8 was grounded[4] by the action of the Suzanne, the tug Elizabeth S. Hooper went to the stern of the barge and after securing a 30' or 40' tow line on the barge, the tug began operations to free the barge. After the barge was released, the barge cast off the stern line and the tug then proceeded to the bow of the barge where towing lines were again placed. Libellant produced testimony tending to show that this entire freeing operation was completed in the southern half of the C & D Canal, or in a maneuvering area of 125'. It was stated on behalf of libellant that at no time did any part of the barge cross the center line of the canal.

In view of the uncontroverted physical facts relating to this operation, the contention of libellant cannot prevail. Here we have a barge 190' long and 40' wide, a tug approximately 83' in length, with a 22' beam and a tow line of 30' to 40', or an overall tow of 303' to 313' in length. Added to this, we must consider that at all material times the tide was running at a rate of 1½ to 2½ knots per hour in an eastwardly direction and against the stern of the barge.

 No detailed knowledge of tug handling, nor any great imagination, is

2. Angles or degrees shall be designated by the symbol ° and feet and inches by the usual symbols ' and " following a figure.

3. The Suzanne is not involved in any manner in this case.

4. The evidence indicates that the barge was aground the whole length of her 190' on the starboard side.

needed to visualize what occurred in this instance. The tug, of necessity, had to pull, at least, to the northwest of west [5] in order to free the stern of the barge from the ground. Considering the length of the tug and the tow line, it must have been on or over the center of the C & D Canal before the stern of the barge broke free. Immediately thereafter the tide, acting as a wedge between the starboard side of the barge and the shore line, assisted the tug in pulling the barge off the ground. However, in this operation, it is apparent from the physical facts that the tug was well to the north of the center line of the canal and that the stern of the barge was on, if not over, the center line before the bow of the barge was released. Upon the releasing of the barge from the ground, the tug had its tow lines cast off in order to secure other lines on the bow of the barge. This temporarily left the barge at the mercy of the current. Since the stern of the barge had momentum toward the north side of the canal, this movement was implemented by the force of the current, thus pushing the barge's stern still further north and undoubtedly close to the north bank of the "cove" before the forward towing lines from the stern of the tug were secured on the bow of the barge. Then again, in order to properly align the tow, the bow of the barge would have to be pulled to the north so a proper strain could be had to begin normal towing operations. All of this maneuvering as has been heretofore indicated would, of necessity, place the tug and her tow far to the north side of the canal and well into the cove, that is, on the north side of the canal west of Chesapeake City Bridge. Fortunately we do not have to rely on measurements and distances alone to arrive at this conclusion. Five witnesses place the tug and tow in the cove on the north side of the canal. Captain Busser, of the S.S. Blydendyk, Captain Rowland, the pilot at the time of the accident, Mr. Benson, the marine dispatcher, Captain Lawrence, the relieving pilot, and Mr. Mitchell, the pilot's launch operator, all agree on the position of the tug and tow immediately preceding the accident.

From the evidence adduced at the trial, it appears that while the tug and tow were maneuvering as heretofore described, the S.S. Blydendyk was approaching Chesapeake City Bridge from the east in a normal manner and simultaneously with her approach to the bridge, the launch with the relief pilot on board, set out to meet the Blydendyk and exchange pilots.

According to the testimony, it is indicated that when the Blydendyk was about 400' or a ship's length east of the tug, the tug suddenly veered to the right, attempting to cross to the south of the canal, and gave one blast of her whistle indicating a hastily conceived attempt to effect a port to port passing situation. This signal was immediately answered by the Blydendyk by four blasts of her whistle, indicating a danger situation, and then by three blasts of the whistle conveying a backing or astern movement, and while these signals were being given, she dropped her port anchor. Meanwhile, the tug continued on her course and crossed the bow of the Blydendyk some 70' to 80' in front of her but she was unable to maneuver the tow with her and as a result, the barge came into contact with the bow of the Blydendyk and the barge was damaged on her port side. As a result of this contact, the towing lines parted and the barge was swept down the port side of the Blydendyk while the tug went past the starboard side. At the time of the contact between the barge and the Blydendyk, the evidence indicates that the Blydendyk had no forward motion due to the fact that from a slow speed against the prevailing tide, she set her engines astern and released her port anchor. Under such circumstances, her forward momentum must be quickly halted.

5. Captain Biggs, of the barge Interstate No. 8, testified for the libellants that the tug pulled the barge toward the north bank of the C & D Canal.

This factual situation is amply borne out by the testimony of both libellant and respondent.

Libellant's testimony, exclusive of the mathematical computations of the relative positions of the tug and tow discussed above, shows that the tug crossed the bow of the Blydendyk and that the barge was on a 30° to 40° angle to the south bank of the canal. Some of their witnesses indicate that the crossing of the bow was at a right angle. The substance of this is corroborated by the respondent's testimony.

Having resolved what we deem to be the factual situation immediately prior to and at the precise time of the accident, we must now assess the blame for this occurrence and place it where we justly believe it belongs.

Libellant relies heavily on the port to port passing situation and the signals given by the tug to indicate such a passing, and the purported failure of the Blydendyk to answer these signals. Libellant further depends on the fact that certain of the respondent's witnesses either did not hear the signals or heard only one of them. Libellant cites many authorities to the effect that signals given or lights shown should have been observed. We think these authorities are not in point in the instant case because there is no substantial dispute about the signals being given or heard. Respondent admits hearing at least the first blast of libellant's whistle and concedes that there could have been a second one. But the effect of the second blast not being heard, if such were the fact, is amply put to rest by libellant's witness, Chief Machinist Birch, who testified that he heard the whistles of both vessels *at the same time, both were sounding together.* Again it is of little moment that the launch man did not hear, or did not remember hearing, the whistle. They were heard by those charged with the duty to hear, namely, Captain Busser and Captain Lawrence. These men immediately reacted with signals of their own.

Article 18, Rule 1 of the Inland Rules, 33 U.S.C.A. § 203, provides in part:

"When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. * * *

"The foregoing only applies to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; * * *

"It does not apply * * * by night to cases * * * where both green and red lights are seen anywhere but ahead."

■ Having given a signal for a port to port passage, libellants invoke the above rule and argue that they were entitled to continue on such a course as would permit this passage. With this we can agree only if the existing situation indicated a port to port passing. In the present instance, no such situation existed. The tug was attempting to cross from the north side of the canal to the south and in so doing had to cross the bow of the Blydendyk. Thus the tug was attempting to create a situation of her own desire but only at the risk of an exceedingly dangerous maneuver, and the blame for the dangerous situation must be borne by the one who creates it. Further, this rule is inapplicable in the instant case because of the ample evidence indicating that both the red and green lights of the tug were seen 1½ to 2 points off the starboard bow of the Blydendyk. This clearly did not indicate a passing or meeting situation.

"Under Article 15 of the new rules of navigation, these vessels were on crossing courses; as respects the Knight, because she saw only the other's green light; and as respects the Gulf Stream, because the two colored lights were not seen ahead,

but from half a point to a point and a half on her starboard bow, for a considerable time before any risk of collision commenced, so that she showed to the Knight only her own green light. By articles 16 and 22, therefore, it was the duty of the Gulf Stream *to keep out of the way,* and of the Knight *to keep her course. The Knight disobeyed this rule by porting.* This manifestly contributed to bring about the collision, and *she is, on that ground, in fault."* (Italics supplied.) Inland & Seaboard Coasting Co. v. The Gulf Stream, D.C., 43 F. 895, 896.

■ Libellant makes the point that the respondent also violated this rule by failure to answer its signal for a port to port passage. This, we believe, is fully answered by the testimony on the signals. The respondent immediately answered the whistle of the libellant by sounding the danger signal. We find that this rule has no application in the present case by virtue of the fact that no danger existed for either vessel until the tug embarked upon its hazardous venture of crossing the canal despite the close proximity of the Blydendyk. It was this improper and unsuccessful attempt of the tug to cross over in front of the on-coming Blydendyk from the north to the south side of the canal, which resulted in the collision for which she must be held responsible.

"The district court concluded, and we think correctly, that when the Ruth observed the Doncaster approaching on the eastern side, the relative positions of the vessels was such that a starboard-to-starboard passing was called for and could have been safely effected. Under those circumstances, the Ruth was justified in expecting that the Doncaster would pass on the starboard side. The only safe and practical course for the Ruth was to stay away from the eastern side of the channel. The Doncaster's improper and unsuccessful attempt to cross over to her right resulted in a collision for which the

Doncaster must be held responsible. See Griffin on Collisions, § 32, p. 75 et seq. (1949) and cases cited therein." The New York Company v. The Robin Doncaster, 3 Cir., 1956, 233 F.2d 889, 892.

Libellant next contends that the respondent violated Article 25 of the Inland Rules (33 U.S.C.A. § 210) which provides as follows:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

■ The evidence adduced on this point shows that the Blydendyk was proceeding westward in the C & D Canal on or near the middle of the channel. Under the existing circumstances and considering that there was no other traffic in the canal, in the immediate vicinity, and the *apparently* safe positions of the Blydendyk and the tug and tow at the time, we are not persuaded that the position of the Blydendyk violated this rule. We know as fact that the Blydendyk is approximately 422' long and that the canal is 250' wide. Thus it is not unreasonable or in violation of the rules for the pilot to use as much of the canal as the law allows for the safe and prudent operation of his vessel. Further, a search of the record does not indicate any evidence showing that the Blydendyk was over the center line of the channel, i. e. on the south side, at any time prior to the accident. Both the evidence and the marked charts introduced as exhibits all tend to agree in substance that the collision occurred in the center of the canal. See The New York Company v. The Robin Doncaster, supra.

■ Libellant also contends that there was a violation of the regulation prescribed by the Secretary of War for the Administration and Navigation of the Chesapeake and Delaware Canal, which provides that vessels proceeding with the current shall have the right of way over those proceeding against the current. This argument must be predicated on the

assumption that the tug and tow were proceeding in an eastwardly direction on the south side of the canal just prior to the collision. As already indicated, this assumption is not well founded. The tug and tow had no right to maneuver in a reckless and hazardous manner, as we have already found, and then claim for themselves privileges and rights to which their actions and positions do not entitle them. Libellant is not justified by her haphazard maneuvering to claim rights accorded to those who are themselves properly obeying the rules of navigation.

Libellant next proposes that the alleged breaches upon which she bases her case render the Blydendyk guilty of statutory fault and therefore within the rule known as the rule in The Pennsylvania, 19 Wall. 125, 126, 86 U.S. 125, 126, 22 L.Ed. 148. With this position we do not agree. The evidence clearly indicates that the Blydendyk was without fault in this collision. In addition to the foregoing discussion, one of the major factors in the case is the time element, and while there is conflict in the oral testimony with respect thereto, the one uncontroverted and undisputed document proving the time element is the engine room log of the Blydendyk. This log shows that the entire occurrence took place in an elapsed time of 1½ minutes, or from 0415 to 0416½. During this period, the engines of the Blydendyk went from stop to full astern to stop, with a "shock" being recorded at 0416½. The times recorded in the log support and corroborate the other credible testimony favoring respondent.

 Considering all the testimony, it becomes apparent that the Blydendyk was proceeding uneventfully and prudently through the C & D Canal until 4:15 A.M., at which time a tug and tow which had been observed in a safe position to the starboard side of the Blydendyk suddenly sounded one blast of her whistle and immediately veered to the right directly into the path of the Blydendyk and toward the south side of the canal. The officers of the Blydendyk reacted immediately and simultaneously gave a danger signal and first stopped her engines and then put them astern and let go the anchor in order to stop their vessel as quickly as possible and to avoid the tug crossing her bow. That she was successful in avoiding the tug is evident from the facts established. However, the tug passed so close by the bow of the Blydendyk that the tow was pushed into the bow by the combined action of the tug and the current, causing the damages complained of. Under these circumstances and considering the time involved, it is inconceivable that the Blydendyk could have acted in a manner other than she did. The situation was unexpectedly thrust upon her without warning and every effort was exerted to avoid a collision. Prior to 4:15 A.M. no danger existed and the Blydendyk could have reasonably assumed that no dangerous situation would arise. None would have had not the tug suddenly changed her course and by her sole fault created a risk of, and in fact, a collision. We can find no evidence in the record establishing fault or blame on the part of the Blydendyk. However, the record is replete with evidence showing that the actions of the tug Elizabeth S. Hooper and her crew were solely to blame for the collision and are therefore solely responsible to the barge Interstate No. 8 for any damages suffered by her as a result of the instant collision.

The above constitute our findings of fact and conclusions of law. We have examined the requests for findings of fact and conclusions of law filed by the respective parties hereto. Insofar as they agree with the findings of fact and conclusions of law herein adopted, they are adopted. Insofar as they do not, they are denied.

An order will be entered dismissing the libel as to the respondent, Holland-American Line, and placing the sole blame for this collision upon the impleaded respondent, the tug Elizabeth S. Hooper and her owners, in accordance with the above findings and conclusions.

Counsel will submit an appropriate form of Order.