**CALIFORNIA TRANSPORT CORPORA-TION, as owner of THE S.S. A. N. KEMP, Libelant,**

v.

**UNITED STATES of America, Respondent.**

**UNITED STATES of America, as owner of THE U.S.S. RIZZI, Libelant,**

v.

**THE S.S. A. N. KEMP, Respondent.**

United States District Court
S. D. New York.

Nov. 8, 1961.

Maclay, Morgan & Williams, New York City, Charles Dickerman Williams, New York City, of counsel, for California Transport Corporation.

Robert M. Morgenthau, U. S. Atty., New York City, Louis E. Greco, Attorney in Charge, Admiralty & Shipping Section, New York City, and George M. Bates, Attorney, Admiralty & Shipping Section, New York City, of counsel, for United States of America.

FREDERICK van PELT BRYAN, District Judge.

On the morning of July 28, 1957 at 0630 hours the super tanker A. N. Kemp and the U.S.S. Rizzi collided in Sandy Hook Channel. The owner of each vessel filed a libel claiming that the collision was caused solely by the fault of the other vessel. The two suits, consolidated for purposes of trial, have been tried before me.

The Kemp is a Liberian flag vessel owned by California Transport Corpora-tion, a Liberian corporation. The owner's suit against the United States meets the requirements of 46 U.S.C.A. § 785.

She is a single screw steam turbine tanker, 624 feet long, 84 foot beam, of 16,071 gross and 9,771 net tons, with a displacement of some 36,000 tons. Her draft fully loaded is 34.4 feet.

The Rizzi is a twin screw, twin rudder steam turbine United States Navy destroyer escort, 326 feet long, 35 foot beam, 1750 tons with a draft of approximately 14 feet.

On the morning of the collision the weather was fair and sunny with visibility excellent, a smooth sea and light wind. Weather is not a factor here.

Sandy Hook channel is 800 feet in width and is dredged to a depth of 35 feet at mean low water. Inbound it runs roughly from northeast to southwest with a channel heading of 254 degrees inbound and 74 degrees outbound.

The collision occurred approximately three hours after low water, with the tide rising to flood. To the east of Sandy Hook there was a tidal current setting to the northwesterly across channel with a velocity of between 1.7 and 2 knots.

The Kemp, inbound from Maracaibo with a full cargo of crude oil, picked up her Sandy Hook pilot at Ambrose at 0600 hours and proceeded up Gedney Channel on a heading of 281. She was being brought in by the pilot with her master also on the bridge. She proceeded to make the turn into Sandy Hook channel.

At 0607 hours the Rizzi, manned by her regular crew, but with a complement of reservist trainees aboard, weighed anchor in Sandy Hook Bay and proceeded to round buoy 15 to the westward of Sandy Hook into Sandy Hook channel. The Rizzi was on a training cruise in company with the U.S.S. Osberg, another destroyer escort, and was following that vessel outbound down Sandy Hook channel and then to southward of the channel to the open sea. On the bridge of the Rizzi a reserve lieutenant was conning

the ship under the direction of her regular captain.

The vessels sighted one another as the Kemp, inbound, was turning into Sandy Hook channel from Gedney channel and shortly after the Rizzi, outbound, had passed Sandy Hook to her starboard. At that time they were roughly two miles apart.

The principal witness for the Kemp was her Sandy Hook pilot. His testimony was supplemented by the testimony before the Coast Guard of her master, junior first mate and helmsman who were also on the bridge. In addition there was expert testimony as to the theoretical results of various projected courses and headings based on log entries and testimony. There was also testimony as to where her starboard anchor, which she left go shortly before the collision, was found.

Witnesses for the Rizzi included her captain, the reserve lieutenant who was taking instruction in conning the ship, her quartermaster and her boatswain. There was also expert testimony on tidal conditions and navigational customs.

The evidence is in sharp conflict as to the course of events leading up to the collision. Each side attempted mathematical demonstrations designed to show that the collision could not have occurred in the manner claimed by the other which were inconclusive. I will not attempt to detail the testimony for the respective parties but will state the facts as I find them to be from all the evidence. They are as follows:

After the inbound Kemp had completed her turn from Gedney channel into Sandy Hook channel she steadied down on a heading of 253 degrees, a degree to port of the channel heading, to allow for the tidal current setting across the channel to the northwestward. She was then somewhat to the north of the center of the channel proceeding at a speed of 14 knots.

The Rizzi had shortly before passed buoy 13 at the tip of Sandy Hook, some 40 yards off her starboard beam, on a heading of 066 which she had been following for several minutes. That heading was 8 degrees to the port of the channel course of 074 and the Rizzi was thus proceeding diagonally across channel toward its north side. As she proceeded down channel after passing Sandy Hook her movement toward the north side of the channel was accelerated by the northwesterly set of the tidal current which was particularly strong at that point. Her movement to the northward is confirmed by the testimony of her quartermaster that she passed buoy 12 about 100 to 150 yards off her port beam. Thus, from buoy 13 on the south side of the channel which she had passed 40 yards to starboard, she had moved at least 230 feet and perhaps as much as 380 feet toward the north side of the channel by the time she passed buoy 12 on the north side of the channel, some 800 feet to the eastward. She was then still on her diagonal course of 066 at a speed of 10 knots.

Shortly after the Rizzi passed buoy 12 she began a turn to starboard and successively, over a three minute period, gave orders to alter her course from 066 to 070 and then to the starboard of the channel course at 080 to 085 to 087. Thus, as she turned her course she swung diagonally back across the channel from north to south. Apparently the Rizzi was intending to follow the Osberg to the south of the channel with buoy 9 on the south side of the channel to her port, and thence to the open sea.

As the Kemp proceeded up channel on her course of 253 degrees her pilot claims to have observed the Rizzi already to the northward of the north line of the channel. At that point the Kemp reduced to half speed as a precautionary measure as she passed buoy 8. She required at least half speed to maintain maneuverability in the channel. At that time, according to the pilot of the Kemp, the Rizzi was proceeding on a course which would have taken her away from the north side of the channel and would have insured an easy starboard to starboard passing without danger or difficulty.

It may be noted that while the Kemp, fully loaded as she was, and with her draft of 34.4 feet, was required to keep within the channel limits to avoid going aground, there were no such restrictions on the Rizzi which had ample water in which to maneuver both north and south of the channel.

There is some doubt whether the course of the Rizzi in fact took her any measurable distance to the north of the north side of the channel. It is plain, however, that at the least she was at or beyond the north side of the channel before she turned diagonally south. This is indicated by her course headings taken in combination with the set of the tidal current. It is to some extent confirmed by a fix taken by trainees aboard the vessel at the direction of the quartermaster which put her position to the north of the north side of the channel shortly before the collision. While the Rizzi sought to impugn the accuracy of this fix on the ground that it was taken by inexperienced trainees, it is significant that other fixes so taken were conceded to be "good". The fix must be given some weight since it is consistent with the other facts.

While the Kemp was proceeding on course up the northerly segment of the channel she observed the Rizzi, well off her starboard bow to the north of the channel, alter her course to starboard. The Kemp immediately blew two blasts for a starboard to starboard passing. At this time the vessels were approximately a mile apart. The Kemp had by then reduced to half speed. The Rizzi since passing the Hook had increased her speed from 10 knots to 12 knots. As she was turning a heading of 087 she ordered 15 knots. The course of the Rizzi would have brought her diagonally across the bow of the Kemp with danger of collision amidships.

The Rizzi responded to the Kemp's two blast signal with a four blast danger signal followed by one blast calling for a port to port passing. When the Kemp received this signal from the Rizzi she in turn blew a danger signal, ordered full speed astern and let go her starboard anchor to check her way. The Rizzi also ordered full speed astern and veered slightly to port. But it was too late for her to avoid a collision. The vessels collided on their respective starboard bows, with the Rizzi on a heading of between 080 and 084, and the Kemp still on a heading of approximately 253.

While it is difficult to pinpoint the precise location of the accident it is plain that it occurred in the northerly segment of the channel at or slightly to the westward of buoy 9. This tends to be confirmed by the position of the starboard anchor of the Kemp which pulled out after being let go and was later recovered in that area.

After the collision the Kemp swung to the southward and some time later let go her port anchor to avoid going aground on the shoals off Sandy Hook. She lost that anchor also. The Rizzi swung around the Kemp and passed astern of her southward to sea.

■ On these facts I find that the collision was caused solely by the fault of the Rizzi. The Rizzi must have been aware that the Kemp was a deep-draft loaded tanker which was required to remain within the limits of the channel. If the Rizzi had maintained her course at the time she sighted the Kemp she would have passed the Kemp to starboard with ample clearance. Instead she altered her course substantially to starboard, without signal to the Kemp, to bring her diagonally across the channel to the south and across the Kemp's bow. Moreover, when the Kemp sounded her two blast signal calling for a starboard to starboard passage, the Rizzi made no attempt to comply. Had she then made rudder to port she still would have made the starboard to starboard passing called for by the Kemp without difficulty. Instead she continued her swing to starboard.

■ The Rizzi was a highly maneuverable shallow draft vessel. Her captain testified that she could complete a 90 degree turn within a minute and a half. In contrast to the Kemp she had plenty

of water in which to maneuver without keeping to channel limits. If she had gone aport with reasonable immediacy after hearing the two blast signal from the Kemp she would have avoided the collision. It was her responsibility to do so. See The Panther, 79 F.2d 625 (2 Cir. 1935).

It was the Rizzi's election to alter her course without consent and to reject the starboard to starboard signal of the Kemp and to call for a port to port passing in the course of her maneuver across channel and across the Kemp's bow which led to the collision. While a starboard to starboard passing is unusual and a port to port passing customary in Sandy Hook channel, nevertheless, in view of the respective positions of the vessels, with the Rizzi on the north of the channel, with plenty of water in which to maneuver, the starboard to starboard passage was the reasonable and proper passage under all the circumstances and it was this which the Rizzi should have adopted. New York, New Haven & Hartford R. R. Co. v. Baltimore & Ohio R. R. Co., 236 F.2d 228 (2 Cir.1956); The Bellhaven, 72 F.2d 206 (2 Cir.1934); The George H. Jones, 27 F.2d 665, 667–668 (2 Cir. 1928); The Californie, 250 F. 790 (2 Cir.1918).

The Rizzi was mistaken as to her position. I find that at no time after passing buoy 12 was she in the southerly segment of the channel as her witnesses testified. The collision occurred in the north segment of the channel. She could not have been fine on the port bow of the Kemp nor in a position where the port to port passing which she called for was feasible.

Whether the Rizzi refused a starboard to starboard passing and called for port to port because of a mistake as to her position or because of her desire to move southward to join her companion ship, the Osberg, for anticipated maneuvers at sea, is immaterial. The fact is her maneuver was fraught with danger and was improper under the circumstances. New York, New Haven & Hartford R. R. v. The Baltimore & Ohio R. R. Co., supra;

Boyer v. Holland-American Line, 176 F. Supp. 550, 554 (D.C.E.D.Pa.1959).

I find that the collision was due to the fault of the Rizzi and that the Kemp acted reasonably and properly under all the circumstances.

Respondent United States, as owner of the Rizzi, is therefore liable to the libelant California Transport Corporation, as owner of the Kemp, for the damage caused by the collision. The issue as to the amount of such damage will be referred to a special commissioner.

The libel of the United States against the Kemp will be dismissed.

The foregoing constitutes my findings of fact and conclusions of law.

Settle decree on notice.