SKIBS AKTIESELSKAPET ORENOR, as owner of THE Steamship MOISIE BAY, and Tankore Corporation, Libellants,

v.

THE Steamship AUDREY, her engines, boilers, etc. and Constantine G. Gratsos, her owner, Respondents.

THE Steamship AUDREY, her engines, boilers, etc. and Constantine G. Gratsos, her owner, Libellants,

v.

SKIBS AKTIESELSKAPET ORENOR, as owner of the Steamship Moisie Bay, Respondents.

Nos. 7821, 7820.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 10, 1960.

Supplemental Opinion March 18, 1960.

Vandeventer, Black & Meredith, Braden Vandeventer, Jr. and Hugh S. Meredith, Norfolk, Va., Kirlin, Campbell & Keating, John F. Gerity and Wm. E. Fuller, New York City, for Moisie Bay, her owners, and Tankore Corp.

Jett, Sykes & Coupland, R. Arthur Jett, Norfolk, Va., Burlingham, Hupper & Kennedy, Eugene Underwood and H. Barton Williams, New York City, for Audrey and owner.

WALTER E. HOFFMAN, District Judge.

At approximately 2021 (Moisie Bay bridge time [1]) on March 24, 1957, during darkness and clear weather, with visibility good, wind moderate, and tide ebb, the Moisie Bay and Audrey collided in the vicinity of the approach to the Maryland Pilot Station off Cape Henry, Virginia. In separate proceedings consolidated for trial we have for consideration the determination of liability for damages occasioned by the impact.

The Moisie Bay is a Norwegian vessel which, at the time stated, was under charter to Tankore Corporation. As a combination oil and bulk ore carrier constructed in 1955, she is 638 feet in length and 80.4 feet in beam. She has a steam turbine engine driving a single propeller to a sea speed of 14½ to 15 knots with the propeller turning approximately 103 RPM. On the night of the collision the vessel was en route from San Juan, Peru, to Baltimore, Maryland, laden to a deep draft by approximately 22,699 tons of iron ore.

The Audrey flies the flag of Greece and is a Liberty type vessel, approximately 442 feet in length and 56 feet 10 inches in breadth. Her power is a steam reciprocating engine driving a single pro-

---

1. All references are to Moisie Bay bridge time, and other times have been adjusted accordingly.

peller to a sea speed of about 11½ knots. On the night of the collision the vessel was on a voyage from Hampton Roads, Virginia, to Denmark, laden by approximately 9,203 tons of coal.

The two vessels were on converging courses, each crossing the path of the other in such a manner that the green side light of the Audrey was off the port bow of the Moisie Bay, and the red side light of the latter bore broad on the starboard bow of the Audrey. The burdened vessel was, therefore, the Audrey, charged with the duty of slowing, stopping, or reversing her engines, if necessary, to avoid crossing ahead of the Moisie Bay. 33 U.S.C.A. §§ 204, 207, 208; Steering and Sailing Rules for Inland Waters, arts. 19, 22, 23. The Moisie Bay, as the privileged vessel, was required to keep her course and speed. 33 U.S.C.A. § 206; Steering and Sailing Rules for Inland Waters, art. 21.

Prior to 1930 the Moisie Bay was approaching sea buoy "2CB", slightly southeast of Chesapeake Bay Pilot Station off Cape Henry, at full sea speed on a course of 298° gyro and true. Navigational lights were set and burning brightly. Her master and second officer were on watch and, along with the wheelsman, were on the bridge. A lookout was posted on the flying bridge. At 2000 all but the master were relieved from their duties and a new watch took over. The third officer relieved the watch officer (second officer) but the latter remained on the bridge. The Maryland Pilot Boat had previously been contacted by radio and the Moisie Bay was instructed to report again upon passing buoy "2CB". Upon reaching this point at approximately 1944, the Moisie Bay was directed to rendezvous for her Maryland pilot near buoy "2A". At this time, when buoy "2CB" bore 044° true, 0.6 miles by radar, the course was changed from 298° to a heading of 315° by gyro to make good a course of 314° true in the direction of buoy "2A".

From this point the Moisie Bay approached the Pilot Station. That there were reductions in speed is conceded as it was necessary to do so in order that the pilot could board the vessel at the rendezvous point. The Audrey knew that the Moisie Bay was inbound headed northwesterly. She noted the exchange of Morse signal lights between the Moisie Bay and the pilot vessels. By taking bearings, the chief officer of the Audrey observed that the Moisie Bay was reducing her headway.

At 2010 there were indications from the plotted observations that the Moisie Bay was experiencing a set to the westward. To compensate for this set, the compass heading was placed on 323° gyro, thus enabling her to make a basic course of 314° to the rendezvous point near buoy "2A".

The alert to "stand by" was received by the engine room of the Moisie Bay at 2001. Four minutes later her speed was reduced to full-ahead harbor maneuvering speed of 11 knots, 65 RPM. At 2010, as noted, she changed her heading 8° to the right. Three minutes thereafter she reduced to half-speed, 8 knots, 40 to 45 RPM, and at 2014 she reduced further to slow-ahead, 6 knots, 30 to 35 RPM. At 2016 she reduced to dead-slow-ahead, 2½–3 knots, 20 RPM. About two minutes prior to the impact, she went full astern and gave three short blasts of her whistle. The clock in the engine room revealed, after the collision, a variation of one minute with bridge time; the latter being faster than the engine room.

The Moisie Bay first sighted the navigation lights of a vessel, which later turned out to be the Audrey, at about 2000, at which time the Audrey was slightly in excess of 7 miles away to port, coming out of the channel from Norfolk and heading to sea. At 2010 the navigation lights of the approaching vessel were observed as she was drawing away from the pilot launch, at which time she started a course crossing that of the Moisie Bay. When the Audrey was observed at 2016, she appeared to be about one mile off the port bow of the Moisie Bay with no apparent indication of change of course or speed. At or about

that time, the master of the Moisie Bay was advised that the Audrey was 0.6 miles distant by radar. At 2018 the Audrey sounded three short blasts of her whistle indicating that her engine was full-speed astern when she was about 45° on the port bow of Moisie Bay. In another 45 seconds or so, the Audrey sounded a second signal of three short blasts, but in the interim was only one-quarter mile off the port bow of the Moisie Bay. At that point the master of the Moisie Bay put the engines full-speed astern and sounded three short blasts at 2019. The Audrey then sounded two short blasts; the Moisie Bay responded in like manner; and, a few seconds prior to the collision, the Audrey again sounded three short blasts. During the final minute prior to the collision the Moisie Bay lost steerageway and would not respond to her rudder.

When the collision occurred at 2021, Moisie Bay bridge time, the vessel had little or no headway. The Audrey struck the port bow of the Moisie Bay at an approximate angle of 90°; the bow hitting between the stem and anchor windlass, passing through the starboard side, and causing the bow of the Moisie Bay to swing to starboard. The Audrey drifted slowly down the port side of the Moisie Bay. Three minutes after the collision, the Moisie Bay went half-ahead under hard left rudder in order to avoid shoal water nearby. The Maryland pilot boarded the Moisie Bay at 2035, and the vessel thereafter proceeded to Baltimore.

The credible evidence supports the contentions of the privileged vessel. The testimony likewise conclusively establishes that the engine log book of the Audrey was fabricated. Manifestly, the page of the original entries for March 24, 1957, in the Audrey's rough engine log book had been removed and presumably destroyed, and in its place appeared a new page of entries on both sides. The log book consists of a number of double-page sheets, printed on both sides to form four pages, and bound in the middle with three staples. When folded from the middle, the book is complete. It is obvious that pages may be removed and replaced with little or no difficulty.

At first blush the continuity of dates before and after the collision would not disclose any irregularity without the aid of a handwriting expert. But when we examine the corresponding pages of the double-page sheet it is clear that a deliberate fraud has been perpetrated. Entries between December 6, 1956, and December 31, 1956, are missing. On December 6, 1956, it is noted that entries were made for sea steaming watches from Portland to Japan, and, on the following page dated December 31, 1956, from Japan to Canada. The Audrey argues that engine log entries are only made while entering and leaving port, and that a record is not maintained while in port except while the vessel is maneuvering. In answer, it is said that the routine revolution counter readings normally recorded at the end of the sea passage when the pilot boards, and again recorded at the commencement of the outbound voyage when the pilot departs, are both missing. These entries, if made, would have appeared on December dates in the forward part of the sheet which, when the same sheet is continued, would include the entries of March 24, 1957, in the latter part of the book.

The fraudulent acts are buttressed by the testimony of a handwriting expert (Hilton) who has pointed to certain embossed impressions on the page dated March 22, 1957, and the absence of such impressions on the page now dated March 23, 1957, which latter page would normally reveal the results of any heavy writing on the opposite side of the page dated March 22, 1957. Nor is the Court impressed with the suggestion that engine movement orders may have been written on scraps of loose paper and thereafter copied into the log book following the collision. The evidence presented by the Audrey points to the fact that all entries on March 24, 1957, were made directly into the log. When we consider the fact that the entries for March 23–24 were made in the same handwriting (presumably that of the

third engineer) and that the third engineer did not go on watch until 1955 (although the entries for the 1600–2000 watch are in the same handwriting), the perpetrated fraud is complete.

■ As was so aptly said by Judge Learned Hand in Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 2 Cir., 102 F.2d 450, quoted with approval by Judge Dobie in The Anaconda, 4 Cir., 164 F.2d 224, 226:

"When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt."

The authorities are legion to the effect that intentional falsification of material records presumptively destroys the weight of the offender's evidence as to the entire case. Allen v. United States, 164 U.S. 492, 499–500, 17 S.Ct. 154, 41 L.Ed. 528; Gung You v. Nagle, 9 Cir., 34 F.2d 848; The Silver Palm, 9 Cir., 94 F.2d 754, 762; Broomfield v. Texas General Indemnity Co., 5 Cir., 201 F.2d 746, 748; Capehorn Steamship Corp. v. Texas Co., D.C., 152 F.Supp. 33, 36.

While there are many inconsistencies and discrepancies in the Audrey's testimony, these only point significantly to a continuation of efforts to conceal the true facts. To detail the theory of the Audrey's case would unduly emphasize the fraud, and perhaps lend dignity to the fraudulent scheme.

■ There remains, however, the insistence that the Moisie Bay was guilty of certain faults which compel a division of damages. For this purpose we look to the activities of the Moisie Bay as disclosed by her evidence for, even though the Audrey be found to blame and her actions be fraudulent, this would not exonerate the Moisie Bay if she was guilty of a statutory fault or otherwise contributed to the collision by improper navigation.

Certain changes in compass direction and speed were concededly made by Moisie Bay while in International waters, and thereafter in Inland waters. Such as are material are noted as follows:

| Minutes prior to collision. | Moisie Bay action. |
| --- | --- |
| -16 | reduced from full sea speed (14½ to 15 knots) to full harbor speed (11 knots). |
| -11 | c/c 8° right. |
| - 8 | reduced speed to half-ahead (8 knots). |
| - 7 | reduced speed to slow-ahead (6 knots). |
| - 5 | reduced speed to dead-slow-ahead (3 knots). |
| - 2 | full astern—3 blasts. |

■■ Under art. 21 of the Inland Rules, 33 U.S.C.A. § 206, as well as under its counterpart, Rule 21 of the International Rules, 33 U.S.C.A. § 146e, it was the duty of the Moisie Bay to keep her course and speed as the privileged vessel. Are these provisions absolute, or may they be dependent upon the navigational circumstances then confronting the approaching vessels? Of course, the word "course" does not mean the actual compass direction—it may be necessary to alter the compass direction to maintain a steady course. As Judge Learned Hand said in Commonwealth & Dominion Line v. United States, 2 Cir., 20 F.2d 729, 731:

"A ship is on a steady course, not only when her heading does not change, but whenever her future positions are certainly ascertainable from her present position and movements. A steady course may thus involve many changes of heading;

it is enough if these can with accuracy be foretold. If they can, so that at any given time in the future her position can be ascertained, she is on a course, and if that course crosses the course of another vessel, who holds her on her starboard hand, the latter must keep out of her way. Whether the way be sinuous, or the speed variable, makes no difference, so it be plainly disclosed."

As Judge Hand uses the foregoing language in a crossing case—even though the collision occurred in a channel—it furnishes support to The Roanoke, 11 Asp.M.C. 253 (C.A.), an English case heavily relied upon by proctors for the Moisie Bay, and cited with approval in Judge Hand's opinion.

In The Roanoke, a collision took place between the American Steamship Roanoke and the English Steamship Windsor in the English Channel, where both vessels were proceeding toward a Pilot Station under a crossing situation. The Roanoke was the privileged vessel and the Windsor was the burdened vessel. The Court of Appeal, in modifying the decision of the trial court which held both vessels at fault, recognized the necessity of viewing the requirement to maintain course and speed in a relative sense, depending upon the circumstances. The Chief Justice said:

"The effect of this decision is of very great importance, because it amounts to a ruling that if two vessels are approaching so as to involve risk of collision, it being known to both of them that the one whose duty it is to keep her course and speed is about to pick up a pilot, and is maneuvering for that purpose, and although the vessel whose duty it is to keep out of the way ought to have seen exactly what was being done, the vessel which had reduced her speed in order to take the pilot on board must nevertheless be held to blame under Art. 21 * * * I cannot think that this is the true view of the law, and it seems to me that such a construction would in many cases render nugatory the express provisions of Arts. 27 and 29.

" * * * In my judgment 'course and speed' in Art. 21 mean course and speed in following the nautical manoeuvre in which, to the knowledge of the other vessel, the vessel is at the time engaged * * * The question must be in each case, 'Is the manoeuvre in which the vessel is engaged an ordinary and proper manoeuvre in the course of navigation which will require an alteration of course and speed; ought the other vessel be aware of the manoeuvre which is being attempted to be carried out.' "

From these expressed views it is apparent that the rule requiring the privileged vessel to keep her course and speed does not impose an obligation which is absolute and binding in all cases and under all circumstances. The presence of pilot boats and the necessity of dropping and picking up pilots are matters which are of every-day occurrence in the ordinary course of navigation. The evidence discloses that those in charge of the Audrey were aware of the location of both Pilot Stations and, indeed, observed the Moisie Bay signalling by flashing light in the direction of the Pilot Boats at approximately 2010. The Moisie Bay was known to be inbound and the Audrey personnel estimated the course of the Moisie Bay at 310°–315°, with added observations of deceleration in speed. It is plain that such changes of course, if any, and the admitted decrease in speed on the part of the Moisie Bay were not only anticipated but also known by, and disclosed to, the Audrey. Certainly with knowledge of the location of the Pilot Stations, and being cognizant of the general need for inbound vessels to pick up a pilot, the Audrey had no right to assume that, in a crossing situation, the speed of the Moisie Bay would not be decreased. For the foregoing reasons it is unnecessary to invoke the rule in The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, as no statutory fault has been found with respect to maintaining course and

speed under the facts and circumstances of this case.

The contention is advanced that the Moisie Bay did not take proper avoiding action in order to escape the collision. Bearing in mind that the Moisie Bay was the privileged vessel approaching a Pilot Station—a fact that was known to both vessels—it was not appropriate for those aboard the Moisie Bay to speculate that the Audrey, as the burdened vessel in a crossing situation, would fail to obey the rules. For the Moisie Bay to so assume and thereby engage in avoiding action would, as has been so frequently said, reduce navigation to a game of bluff. Hellenic Lines v. The Exmouth, 2 Cir., 253 F.2d 473, 476, certiorari denied 356 U.S. 967, 78 S.Ct. 1006, 2 L.Ed.2d 1074; Wilson v. Pacific Mail S.S. Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651; Pacific-Atlantic S.S. Co. v. United States, 4 Cir., 175 F.2d 632. A mere error of judgment forced upon the privileged vessel by the fault of the burdened vessel is not sufficient where the circumstances are such as existed here, and any doubt as to the propriety of the navigation of the Moisie Bay should be resolved in her favor. Compania DeNavegacion Cebaco, S. A. v. The Steel Flyer, 4 Cir., 200 F.2d 643; Nicolas Eustathiou & Co. v. United States, D.C., 178 F.Supp. 33, 40; Griffin on Collision, § 51(4) p. 153. The avoiding action on the part of Moisie Bay, i. e., putting her engine full speed astern and sounding a three short blast signal after receipt of the second three short blast signal of the Audrey, was proper under the facts and circumstances confronting the Moisie Bay in this crossing situation.

The testimony discloses that the lookout on the Moisie Bay went below at about 2010 to prepare for the boarding of the pilot. If the navigators of both vessels had not had the other vessel in sight and under observation at all times pertinent, or if the weather conditions and visibility had not been excellent, such action on the part of the lookout could seriously prejudice the rights of the

Moisie Bay. But it is well settled that, under such circumstances as existed on the night in question, the absence of a specific lookout is immaterial. In The Georg Dumois, 4 Cir., 153 F. 833, 835, it is said:

"If the schooner was seen at a distance sufficiently great to have enabled the steamer to pass her in safety, then the collision must have been caused by some fault other than the absence of a lookout."

Assuming arguendo a statutory fault as to the absence of a lookout from 2010 to the moment of collision, it could not have been reasonably possible that such fault had anything to do with the collision.

Nor is it of significance that, at 2010, the Moisie Bay did not give a one-blast signal when she adjusted her heading 8° right to 323° to compensate for the set that she was experiencing. At that time the Moisie Bay was just outside the line marking waters governed by Inland Rules, but the Audrey was plainly within the area governed by Inland Rules. A one-blast signal under International Rule 28(a), 33 U.S.C.A. § 147, means "I am altering my course to starboard." Under the Pilot Rule for Inland Waters, 33 C.F.R. § 80.03, it signifies the same except that when two steam vessels are approaching each other at right angles or obliquely, it is evidence of an intention of the vessel to the starboard to hold course and speed. It is fair to assume that, at the time stated, a whistle signal from the Moisie Bay would be reasonably interpreted under the Inland Rules. The Knoxville City (Isthmian S.S. Co. v. American-Hawaiian S.S. Co.), 9 Cir., 112 F.2d 223. If the signal had been given under Inland Rules, the Audrey would have been advised of nothing other than the fact that the Moisie Bay intended to hold course and speed in the maneuver it was undertaking in approaching the Pilot Station, all of which has been heretofore discussed.

Upon consideration of the evidence as a whole it is manifest that the collision was undoubtedly due to the grossly improper navigation of the Audrey whose

actions could not be anticipated. Were it necessary to so find, it would seem appropriate to invoke the major-minor fault rule. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; Webb v. Davis, 4 Cir., 236 F.2d 90. Any reasonable doubt as to the propriety of navigation on the part of the Moisie Bay should be resolved in her favor.

The collision point was established by the Moisie Bay, through the use of her radar for direction and distance, as a position with buoy "2A" bearing 347° true, distant 0.6 of a mile. While undoubtedly this point is subject to minor variations, it is the most credible evidence available and is reasonably acceptable. The Audrey did not take any fix to ascertain her position in the collision area. As noted, the testimony presented by the Audrey is entitled to only slight credibility because of the glaring inconsistencies and the obvious fabrication of the log.

To reconstruct the course and speed of the Audrey in light of the fabricated log and inconsistencies revealed by the testimony would be an impossible task. The most that can be accomplished is to summarize the Audrey's version. Adjusting times to Moise Bay bridge time, as there was five minutes difference in the bridge times of each vessel, the following appears to be the sequence of events according to the Audrey testimony. At 2005, the vessel dropped her pilot just before Cape Henry Light came abeam, after which she put her engines full ahead and set her course on 85°. At that time the Moisie Bay was observed on the Audrey's starboard bow, showing her red side light and her white masthead and range lights. At 2007 the Cape Henry Light was abeam distant one mile, at which time the Moisie Bay was broad on the Audrey's starboard bow approximately 2.5 miles. The Audrey contends that her chief officer took frequent bearings of the Moisie Bay and noted that they were steadily decreasing, indicating that the Moisie Bay would cross ahead of the Audrey and, at 2009, he noted that the bearings had become constant, and thereafter the Audrey reduced her speed from full ahead to slow. At 2010 the Audrey put her engines half astern and sounded a three-blast signal. At 2011 the bearing was still constant and the Audrey put her engines full astern and again sounded a three-blast signal. During the succeeding eight minutes the Audrey continued backing and made no change of course due to the possibility of grounding on shoal water to the starboard. All of this time the Moisie Bay continued on, although at diminishing speed. By 2019 the Audrey had lost her headway, her bow began to fall off to port, and she sounded a two-blast signal which was answered by a one-blast signal and, at 2021, the vessels collided bow to bow at approximately right angles. The Audrey says that the point of collision was about one mile southwest of buoy "2A". It should be emphasized that the Court does not adopt the factual statements set forth in this paragraph, but has merely attempted to summarize the Audrey's contentions as to her navigation. To accept the Audrey's version would be tantamount to finding that she went full astern ten minutes before the collision, which is exactly what the fabricated log discloses. It is, in this case, a proper inference to suggest that if the original log had been produced, the document would have been unfavorable to the Audrey and her witnesses would, of necessity, have testified as to a contrary set of facts.

We have not overlooked the evidence pointing to changes in the Moisie Bay bell book and rough deck log book. In the bell book the time of collision was originally recorded at 1920 and thereafter changed to 2020. The excitement of the moment undoubtedly caused this error which is too apparent to require further dicsussion. The rough deck log book reveals an erasure of two full lines of routine course and heading figures for a period more than 37 minutes prior to the collision. In explanation, it is at least arguable that these two lines were erased to permit the insertion of a third line of figures previously omitted. The

same numbers erased were rewritten in smaller figures. The approach to the problem as respects the Moisie Bay documents is in sharp contrast to the position of the Audrey. As Justice Story said in The Pizarro, 2 Wheat. 227, 15 U.S. 227, 4 L.Ed. 226:

" * * * Concealment, or even spoilation of papers, is not of itself a sufficient ground for condemnation in a prize court * * * If the party in the first instance fairly and frankly explains it to the satisfaction of the court, it deprives him of no right to which he is otherwise entitled. If, on the other hand, the spoilation be unexplained, or the explanation appear weak and futile; if the cause labor under heavy suspicions, or there be a vehement presumption of bad faith, or gross prevarication, it is made the ground of a denial of further proof, and condemnation ensues from defects in the evidence which the party is not permitted to supply."

We do not believe, under the circumstances revealed by this record and the testimony of the handwriting expert, that any improper inferences should be drawn from the several changes in the Moisie Bay documents. On the other hand, while we may be justified in rejecting the Audrey's claim for recovery because of her fabricated log entries, we have nevertheless analyzed all of the evidence to ascertain whether the Moisie Bay is entitled to full damages, attaching to such evidence all reasonable and proper inferences to be drawn therefrom.

Stripped of all non-essentials this case narrows itself down to two points; one of fact and one of law. The factual issue is whether the Audrey log has been fabricated as this Court has now found. If the Court is in error as to this point, the case must be reversed and remanded. The legal question involves the interpretation of Article 21 requiring the privileged vessel to keep her course and speed in approaching a Pilot Station where such a fact is known by the burdened vessel. If the Court is correct on the

issue respecting the fabricated log, but incorrect on its interpretation of Article 21, the situation would call for a division of damages.

Holding that the Audrey was solely responsible for the collision on March 24, 1957, an appropriate decree will be prepared and presented by proctors for the Moisie Bay, with a reference of damages to a Commissioner. This memorandum is adopted by the Court in lieu of specific findings of fact and conclusions of law pursuant to General Admiralty Rule 46½, 28 U.S.C.A.; reserving to proctors for both parties the right to request specific findings as to matters, if any, not covered herein, providing said requests are not in the nature of reargument and are submitted within twenty days from this date.

#### Supplemental Memorandum.

Subsequent to the filing of the original memorandum herein, proctors for the Audrey requested, pursuant to invitation from the Court, more specific findings on certain phases of the case. They will be discussed briefly.

It is suggested that the Court should find that at 2018, when the Audrey sounded her first three-blast whistle, and again at 2018¾ or thereabouts, when the Audrey sounded her second three-blast signal, the engines were actually put half-speed astern and then full-speed astern, respectively. This may be a proper inference to draw from the evidence but for the fabricated log. However, as noted, it is a matter which enters the field of conjecture as to what, if anything, was actually done with her engines at these particular times. The question would become of importance if the evidence does not justify the finding as to the Audrey's fabricated log.

The Audrey requests a finding that, at 2017, one minute before she sounded her first three-blast whistle, she reduced her speed from full-ahead to slow-ahead. Such a determination of fact is subject to the same comments as contained in the foregoing paragraph.

It is pointed out that the memorandum opinion does not explicitly fix the positions of the Moisie Bay at various times, and that references should be made to markings on the chart introduced in evidence. The accuracy of markings on charts by witnesses is always subject to some variation. Since the essential facts relating to the navigation of the Moisie Bay have been incorporated in the memorandum, no useful purpose will be served by specific findings with reference to the chart at the times suggested by proctors for the Audrey, i. e., at 1944, 1954, 2000 and 2010.

Complaint is made that the opinion does not mention the courses recommended in the Sailing Directions published in the Coast Pilot of the United States Coast and Geodetic Survey; the Coast Pilot having been introduced in evidence. Such recommended courses have some evidentiary value in certain cases, but we think that it is of little significance here as the course of the Moisie Bay was at all times known to the Audrey under ideal weather conditions. For like reasons it is essentially immaterial that no reference is made to the position of the Moisie Bay when her compass heading was placed on 323° gyro, to enable her to make a basic course of 314°.

The Moisie Bay was equipped with a course recorder, a matter not discussed in the original opinion. There are admitted variances between the course recorder, the entries made in the log, and the testimony of Moisie Bay witnesses, but the evidence strongly suggests, and the Court so finds, that an approximate error of 10° existed in the course recorder.

It is uncontradicted that the Moisie Bay took no accurate bearing of the Audrey by polaris. At or about 2016, as indicated in the opinion, a bearing was taken by radar. The evidence does not reveal that any other accurate bearings were taken by polaris, radar, or otherwise.

Finally, it is said that the Moisie Bay did not sound the danger signal of five or more blasts *permitted* by 33 U.S.C.A. § 147(b). Such a signal is, of course, permissive but not mandatory. The signal was not given by the Moisie Bay. From the opinion it will be noted that approximately two minutes after the master of the Moisie Bay had been advised that the Audrey was 0.6 miles distant by radar, the Audrey gave three blasts of her whistle, an indication that her engines were full-speed astern. At or immediately prior thereto, the master of the Moisie Bay had reflected upon the wisdom of giving a few blasts of the whistle. Whether the effect of the Audrey's three-blast signal altered his actions is debatable, but the danger signal from the Moisie Bay would not have advised the Audrey of any fact not then known in the exercise of due care on the part of the burdened vessel.

Adopting these supplemental findings and comments pursuant to General Admiralty Rule 46½, 28 U.S.C.A., a decree may be presented after inspection and endorsement by proctors for the Audrey.