**ALBATROSS TANKER CORPORATION, as Owner of Steamship ERNA ELIZABETH, Libelant-Appellee,**

v.

**S.S. AMOCO DELAWARE and American Oil Company, Respondents-Appellants.**

**AMERICAN OIL COMPANY, as Owner of the S.S. AMOCO DELAWARE, Libelant-Appellant,**

v.

**S.S. ERNA ELIZABETH, her engines, etc., and Albatross Tanker Corporation, Respondents-Appellees.**

Nos. 508, 509, Docket Nos. 33035, 33036.

United States Court of Appeals Second Circuit.

Argued May 8, 1969.

Decided Sept. 17, 1969.

American alleges (1) that the *Erna* failed to post and keep a proper lookout and the District Court erred in not so holding; (2) that the Court erred in failing to condemn the *Erna* for violating her statutory duty to stay to her right when navigating in a narrow channel—the Narrow Channel Rule; (3) that the Court committed error in holding that no whistle signal was required of the *Erna* when she spotted the *Amoco;* (4) that the Court erred in failing to condemn the *Erna* for negligently delaying her astern engine maneuver after she had sounded her own danger signal; and (5) that the *Amoco* had sighted the *Erna* at 4:27 and had signaled an intent to pass the *Erna* port-to-port.

John F. Gerity, New York City (Kirlin, Campbell & Keating, Richard H. Brown, Jr., and J. G. Schulmeisters, New York City, on the brief), for appellant.

Eugene Underwood, New York City (Burlingham, Underwood, Wright, White & Lord, Kenneth H. Volk, and Frank L. Wiswall, Jr., New York City, on the brief), for appellee.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

MOORE, Circuit Judge:

This is a case where two ships collided on a clear night as they were rounding the northern tip of Staten Island. The Court below found that the ships, traveling in opposing directions and proceeding on courses which plotted concentric arcs, would have passed successfully starboard-to-starboard if the *S.S. Amoco Delaware* (*Amoco*), owned by appellant American Oil Company (American), had not suddenly swerved sharply to starboard, entering the Anchorage Ground where the *S.S. Erna Elizabeth* (*Erna*), owned by the Albatross Tanker Corporation (Albatross), was moving up the inner arc, and rammed her starboard side. American appeals from this determination and assigns five errors on appeal.

The facts found by the trial court, supported by the evidence, are as follows. The collision occurred on November 25, 1962, on the Anchorage Ground off Tompkinsville, Staten Island. It was a clear night and the required navigation lights of both vessels, which were tankers, were set and burning brightly. The *Amoco* left her berth in Newark, New Jersey at about 3:00 a. m. on the morning of the collision, destined for Port Arthur, Texas. Shortly before the collision, she was proceeding outbound in an easterly direction through Kill van Kull, intending to turn southward into the channel. The *Erna* pulled up anchor the same morning at about 4:00 a. m. from her anchorage off Stapleton, Staten Island and proceeded in a northerly direction up the coast of Staten Island, always remaining in the Anchorage Ground and intending to enter the Kill van Kull by keeping close to the Staten Island shore.

The *Amoco* first sighted the *Erna* and sounded a one-blast signal at 4:29 a. m.[1] At this point, the *Erna* was on the Anchorage Ground proceeding in a northerly direction and was just passing an anchored vessel named the *Excelsior.* The *Erna* was traveling on an arc paralleling the shore of Staten Island,

---

1. See discussion *infra.*

heading into the Kills.[2] The one-blast signal from the *Amoco* at 4:29 signified *Amoco's* intention to direct her course to her own starboard and pass the *Erna* port-to-port. If each ship had adhered to the course she was on at 4:29, a starboard-to-starboard passing would have been effected without difficulty. A port-to-port passing, on the other hand, would have been highly dangerous if not impossible. The *Erna* sounded a danger signal which rejected the *Amoco's* proposal for a port-to-port passing. The *Erna* properly and promptly rejected this proposal by sounding a danger signal. The *Amoco* also sounded a danger signal. At this point, there was no likelihood of collision if each vessel had maintained its course, but the *Amoco* put her engines astern and veered sharply to starboard. The *Erna* promptly then put her engines astern, but the *Amoco* entered the Anchorage Ground and collided there with the *Erna*.

■ American contends that the *Erna* failed to post a proper lookout. This argument is based largely on American's version of what such a lookout could and should have seen—a version which was rejected by the trial court after full consideration of the conflicting evidence. The trial court reasonably found that all the information that could have been reported by a lookout had been seen and heard on *Erna's* bridge in ample time. Any lack of proper lookout, therefore, was not causally related to the collision.

■■ American next claims that the *Erna* failed to comply with the Narrow Channel Rule, 33 U.S.C. § 210. But the Narrow Channel Rule did not apply to the *Erna* while she was in the Anchorage. Designated anchorage grounds are not part of the channel. The George F. Randolph, 200 F. 96, 97 (2 Cir.). The Court below found that the *Erna* "remained on the Anchorage Ground at all times" and "never navigated within a narrow channel." This finding is not challenged by American.

Furthermore, the Narrow Channel Rule applies only when "it is safe and practicable." The Court below accepted the *Erna's* expert testimony that the *Erna's* intended course through the Anchorage "was the most seamanlike and safe under the circumstances." Additionally, to have gone directly into the main ship channel after leaving anchor would have involved the risk of crossing traffic lanes twice and, more importantly, potentially of grounding at the northern edge of the Constable Hook reach.

■ American alleges that if the situation was a starboard-to-starboard passing, then the *Erna* should have sounded a two-blast signal. 33 U.S.C. § 203; 33 C.F.R. § 80.03. Yet as this Court stated in New York, N. H. & H. R. v. B. & O., 236 F.2d 228 (2d Cir. 1956), vessels moving parallel to each other on their starboard sides "need not reach an agreement before proceeding with a starboard-to-starboard passing." *Id.* at 231. The trial court found that the vessels were moving in parallel. Pilot Rule 80.2, 33 C.F.R. § 80.2, directs "Steam vessels are forbidden to use what has become technically known among pilots as 'cross signals,' that is, answering one whistle with two, and answering two whistles with one." The *Erna's* response to the *Amoco's* one-blast signal—that is, *Erna's* danger signal—was a rejection of *Amoco's* port-to-port passing proposal, which, in effect, amounted

2. Previously, tugs had assisted the *Erna* from her anchorage by turning the *Erna* in a counterclockwise motion, which motion she was continuing on her own as she proceeded northward. In making the finding of where the *Erna* was located at 4:29, the Court accepted the disinterested estimate of the *Excelsior's* watch officer, William T. Patterson, who saw the collision develop. His testimony corroborated that of the *Erna's* pilot, Clyde Valley, and its captain, Harold E. Sharpe. The Court concluded that the *Amoco* did not see the *Erna* until after the *Erna* had emerged from behind the *Excelsior*. Testimony of *Amoco's* pilot, Haley, and master, Tinker, to the contrary was mutually inconsistent. Their testimony conflicted as to the color and location of *Erna's* side and mast lights which she was allegedly showing to the *Amoco*.

to a signal indicating the *Erna's* intention to pass starboard-to-starboard. See Griffin on Collisions, at page 85. Merritt-Chapman & Scott Corp. v. Texas Co., 98 F.2d 719 (2d Cir. 1938). American argues that after sounding her danger signal, the *Erna* was under a duty to sound a two-blast signal for a starboard-to-starboard passage. However, the district court found that until the *Amoco's* last-minute swing to starboard "collision was not imminent and that the vessels would have passed starboard-to-starboard had not the *Amoco* continued swinging sharply to the right." This and other findings led to the court's factual conclusion that "the proximate cause of the collision was the *Amoco's* fault in mistaking a starboard-to-starboard passing situation for a crossing situation, changing course to her right, leaving the channel, and encroaching on the Anchorage Ground where the collision took place."

American contends that the *Erna* did not reverse her engines soon enough after sounding her danger signal and that failure to do so caused the collision. However, no collision was imminent when the *Erna* signaled rejection of *Amoco's* port-to-port passing proposal since, if each vessel had kept its course, they would have passed at a substantial distance to starboard of each other. Collision became a reality only when the *Amoco* did the unexpected, turning sharply into the Anchorage Ground and then, as soon as the *Amoco's* starboard turn made it appropriate, the *Erna* put her engines astern.

American finally asserts that the *Amoco's* one-blast signal at 4:29 was the second warning to the *Erna* that the *Amoco* was turning to its port and that it intended the vessels to pass on their port sides. The bell book entry ("0427 tug away. Sounded one blast.") and testimony of Haley and Tinker, the pilot and the captain of the *Amoco*, show that the 4:27 signal was not made to the *Erna* but to the departing *McAllister* tug. The Court below discounted later testimony to the contrary as an effort to recant these statements. The Court saw and heard the witnesses and was in the best position to make the decision as to credibility.

The interlocutory judgment is affirmed.