MAROCEANO COMPANIA NAVIERA, S.A., as Owner of the S.T. PEN-TELIKON, Plaintiff,

v.

S.S. VERDI, her engines, boilers, etc., and Italia Societa Di Navigazione, Defendants.

ITALIA SOCIETA DI NAVIGAZIONE, as Owner of the S.S. VERDI, Plaintiff,

v.

S.T. PENTELIKON, her engines, boilers, etc., and Maroceano Compania Naviera, S.A., Defendants.

Nos. 65 Ad. 580, 642.

United States District Court, S. D. New York.

May 8, 1970.

Healy & Baillie, by Allan A. Baillie, and Nicholas J. Healy, New York City, for plaintiff S. T. Pentelikon.

Burlingham, Underwood, Wright, White & Lord, by Eugene Underwood, Kenneth H. Volk and Frank L. Wiswall, Jr., New York City, for defendant S. S. Verdi.

CANNELLA, District Judge.

These consolidated actions arise out of the collision on April 16, 1964 of the S. T. Pentelikon and the S. S. Verdi in the Strait of Gibralter near Tarifa. Each vessel brought suit against the other, alleging the other to be solely at fault. The Verdi subsequently admitted fault on her part and the only issue presently before this court is the fault of the Pentelikon.[1] The court finds that the Pentelikon was equally at fault for the collision along with the Verdi and thus orders that the damages be divided.

The court has jurisdiction over this admiralty action pursuant to 28 U.S.C. § 1333.

The S. T. Pentelikon, a single screw super-tanker some 725'-08" in overall length and 92'-06" in breadth, is owned by Maroceano Compania Naviera, S. A., a Panamanian corporation. The S. S. Verdi is a twin screw passenger-cargo vessel some 528'-06" in overall length and 69'-04" in breadth owned by Italia Societa Di Navigazione, an Italian corporation.

The parties agree as to most of the facts which surround the collision, but differ substantially as to their appraisal of the Pentelikon's actions. Under the brilliant ray of considered hindsight, counsel for each party has laid before the court a superb analysis of what action each vessel *should* have taken. Unfortunately, the masters of these two vessels did not have their able counsels' assistance available to them on the night of April 16, 1964. The weather that night was clear, visibility was good, and an East Southeast wind of Beaufort force 3–5 was blowing.[2]

The Pentelikon was eastbound from the Atlantic Ocean, having changed course from 113° to 087° at 2345 hours (April 15) and to 090° at 0010 hours (April 16).[3] Her speed over the ground was somewhere in the area of 13 knots since her progress was being retarded by the wind effect on her large sail area and the current.[4] This court finds that the Pentelikon, after having sighted the Verdi, maintained her course of 090° up until the time she was *in extremis* as was required of her by the International Rules of the Road, Rule 21.[5] The Verdi argues that the Pentelikon changed course; however, all the crew present on the bridge of the Pentelikon testified that she maintained a constant course of 090°. Although this cannot be absolutely substantiated since the Pentelikon did not have a working course recorder, the court believes the Pentelikon's witnesses in this regard. In addition, the Pentelikon also maintained her speed as required by Rule 21 until the point of *in extremis*. The Pentelikon's master, Ni-

---

1. See Pre-Trial Order, filed Feb. 1, 1968. The parties stipulated that the issue of damages would be tried separately or submitted to a special master; however, for the purposes of this action, there was admittedly damage sustained to both vessels.

2. Pre-Trial Order, p. 3.

3. Trial Minutes, pp. 87, 100, 172–73, 385.

4. Trial Minutes, pp. 200, 393, 430–35; Exhibit 7.

5. Rule 21 provides: "Where by any of [these Rules] one of two vessels is to keep out of the way, the other shall keep her course and speed. When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision."

colaos Hazapis, estimates that he first sighted the Verdi at 0135 hours[6] and that her course according to a bearing taken with a "seaman's eye" was in a southerly direction. No accurate bearing by pelorus or radar was taken by the master or crew, rather Captain Hazapis was content to rely on his estimate. The courses of the two vessels were such that there was a crossing situation with the Pentelikon the privileged vessel. Rule 19 of the International Rules of the Road states: "When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." The bearing of the Verdi did not significantly change, except perhaps during her maneuvers to avoid a third vessel, and thus there was certainly a danger of collision present.[7] Therefore, Captain Hazapis flashed the letter "U" by International Morse Code[8] on the blinker light since it was night-time. When no action was taken by the Verdi, the letter "U" was again flashed and the Danger Signal pursuant to Rule 28(b) of the International Rules of the Road[9] was sounded on the ship's whistle. Several minutes later, Captain Hazapis ordered "Hard to Starboard" and rang down emergency astern on the telegraph; that is, he rang full astern twice. Nevertheless, the collision occurred, and the Verdi's bow struck the Pentelikon's port side amidships causing extensive damage to both vessels.

Meanwhile, the Verdi, which had been proceeding westward on a course of 242° after passing abeam of Tarifa Cape Light[10] at 0202 hours,[11] sighted two vessels approximately eight minutes later —the Pentelikon and another vessel which was never identified [hereinafter "UNO" (Unidentified Navigating Object)]. The Verdi determined that the Pentelikon's bearing was broadening and therefore concerned herself with the UNO. Thus, the Verdi changed course to 257° to pass astern of UNO, and after doing so, she again altered course—back to her base course of 242°.[12] At this time, the Verdi's master, Giovanni Peranovich, became concerned with the Pentelikon and the risk of collision. See Int'l Rules of the Road, Part D—Steering and Sailing Rules, Preliminary 1 & 2. Since the Verdi was the burdened vessel under the Crossing Rule (Rule 19), she should have taken early action to avoid the Pentelikon,[13] slackened her speed,

6. Trial Minutes, pp. 187–90.

7. The "Preliminary" statements under Part D—Steering and Sailing Rules—of the International Rules of the Road, subpart 2 states: "Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist."

8. The letter "U" when sent as a single letter has the meaning under the International Code of Signals of "You are standing into danger." See Int'l Code of Signals, H.O. 103.

9. Rule 28(b) provides that: "Whenever a power-driven vessel which, under [these Rules], is to keep her course and speed, is in sight of another vessel and is in doubt whether sufficient action is being taken by the other vessel to avert collision, she may indicate such doubt by giving at least five short and rapid blasts on the whistle. The giving of such a signal shall not relieve a vessel of her obligations un-

der [Rules 27 and 29 or any other Rule], or of her duty to indicate any action taken under [these Rules] by giving the appropriate sound signals laid down in this [Rule].

10. See Exhibit 17.

11. The times between the two vessels vary materially. No attempt has been made to correct one, or both, to a standard time, but rather each vessel's action is given in its own time. The Verdi's collision time is 0220 hours, whereas the Pentelikon's is 0143 hours. No purpose is served by a correction as long as one is aware of the difference.

12. Trial Minutes, pp. 62–64, 285–86.

13. See Int'l Rules of the Road, Part D, Preliminary 1. Rule 22 states: "Every vessel which is directed by [these Rules] to keep out of the way of another vessel shall, [so far as possible, take positive early action to comply with this obligation, and shall], if the circumstances of the case admit, avoid crossing ahead of the other."

stopped, or reversed,[14] or taken other action to avoid the collision or crossing ahead of the Pentelikon. She did none of these things. Because of these errors, and others, including her failure to sound course changes on the ship's whistle,[15] the Verdi has prudently admitted liability. The Verdi was also at fault for turning to port in her last maneuver and thus tending to cross ahead of the Pentelikon[16] instead of turning to starboard, which would have tended to have her pass astern of the Pentelikon. However, this maneuver may be excusable in view of the fact that the vessels at that time were *in extremis*.

■ Although it is thus apparent that this collision might have been avoided had the Verdi taken the action required of her, this does not necessarily mean that the Pentelikon was without fault. The Verdi has done more than just raise a doubt as to the fault of the Pentelikon; rather, it has proven by clear and convincing evidence the Pentelikon's contributory fault. See United States v. S. S. Soya Atlantic, 213 F. Supp. 7 (D.Md. 1963), aff'd 330 F.2d 732 (4th Cir. 1964). Cf. The City of New York, 147 U. S. 72, 84–85, 13 S.Ct. 211, 37 L.Ed. 84 (1892). Furthermore, the logic of the *Pennsylvania* Rule is applicable here. When there is a violation of a rule which is designed to prevent collisions, the violator must show not only that her violation "might not have been one of the causes, or that it probably was not, but that it could not have

been" a contributory factor to the collision. The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873). See, e. g., Anglo-Saxon Petroleum Co., Limited of London, England v. United States, 222 F.2d 75, 77 (2d Cir. 1955).

■ The Verdi contends that the Pentelikon was at fault in a number of ways. One of these, namely, that the Pentelikon altered her course while she was privileged and thus under a duty to hold her course and speed, is essentially a question of fact which has already been resolved by this court's finding that no such course change occurred until the *in extremis* point was reached.[17] The Pentelikon did no more than follow the statutory command of Rule 21. See, e. g., Skibs Aktieselskapet Orenor v. The Audrey, 181 F.Supp. 697, 701–702 (E.D. Va. 1960), aff'd Gratsos v. the Moisie Bay, 287 F.2d 706 (4th Cir. 1961). Likewise, the Pentelikon was required to, and did, maintain her speed till *in extremis*. The Britannia, 153 U.S. 130, 14 S.Ct. 795, 38 L.Ed. 660 (1893); Zim Israel Navigation Co. v. S. S. American Press, 222 F.Supp. 947 (S.D.N.Y. 1963), aff'd, 336 F.2d 150 (2d Cir. 1964), cert. denied, 380 U.S. 954, 85 S.Ct. 1089, 13 L.Ed.2d 971 (1964). However, this does not mean that the Pentelikon could hold her course and speed all the way into collision. At some point in time—the *in extremis* point—the privileged vessel is duty bound under the General Prudential[18] and the Good Seamanship[19] Rules to take some affirmative action

---

14. Rule 23 states: "Every power-driven vessel which is directed by [these Rules] to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

15. Rule 28(a) provides for the proper whistle signals upon execution of a course change.

16. See Rule 22; Sawyer v. McDonald, 165 F.2d 426 (5th Cir. 1948).

17. The finding that no course change occurred renders the alleged failure to give a whistle signal for it moot.

18. Rule 27 provides: "In obeying and construing [these Rules] due regard shall

be had to all dangers of navigation and collision, and to any special circumstances, including the limitations of the craft involved, which may render a departure from [the above Rules] necessary in order to avoid immediate danger."

19. Rule 29 provides: "Nothing in [these Rules] shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper look-out, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." See also Rule 21.

toward avoidance of the collision. Postal S. S. Corp. v. El Isleo, 308 U.S. 378, 386–387, 60 S.Ct. 332, 84 L.Ed. 335 (1939); Sawyer v. McDonald, 165 F.2d 426, 429 (5th Cir. 1948); Kinsman Transit Co. v. United States Steel Corp., 141 F.Supp. 815, 817 (N.D.Ohio 1956); Standard Oil Co. of N. J. v. United States, 92 F.Supp. 696 (S.D.N.Y. 1950). The rub here is in determining when the *in extremis* point was reached. There are no mathematical formulas to be applied and no visible lines drawn on the water's surface; rather, the point is one of reasoned and considered judgment taking into account the dictates of good seamanship. The Gulfstar, 136 F.2d 461, 464 (3d Cir. 1943). After considering the closeness of the vessels at the time, the obvious inaction of the Verdi, and the overall circumstances and conditions, the court finds that the master of the Pentelikon should have taken action immediately after he gave the second "U" signal and blew the danger signal, since his vessel was *in extremis* at that time. By failing to take such affirmative action, the Pentelikon was at fault in this regard unless she can justify her conduct. See Postal S. S. Corp. v. El Isleo, *supra;* Kinsman Transit Co. v. United States Steel Corp., *supra.* The Pentelikon has failed to justify her conduct of inaction or to show in any way that it could not have contributed to the collision. The Pennsylvania, *supra;* States S. S. Co. v. Permanente S. S. Corp., 231 F.2d 82, 87 (9th Cir. 1956). In fact, it is obvious that the failure to take action on the part of the Pentelikon was a significant factor in this collision.

The Verdi also alleges that the Pentelikon was at fault for failing to have an operable course recorder; for failing to have utilized the radar on board; for failing to have ascertained the Verdi's course and speed by taking bearings of her or in any other manner; and for failing to have a constant lookout on duty during and prior to the collision.

■ The failure to provide an operable course recorder in this case could not have been the proximate cause of the collision or have contributed to it in any manner. There was no proof presented at trial that a course recorder is required equipment under either foreign or international regulations.[20] The course recorder does not in any way aid in the navigation of a vessel, rather it shows *ex post facto* what a vessel has done.

■■ A lookout is required by both the International Rules of the Road[21] and by good seamanship. The failure to have one can at times be a fault and the cause of a collision, especially if there is no knowledge of the other vessel. See, e. g., The Colorado, 91 U.S. 692, 699, 23 L.Ed. 379 (1875); United States v. S. S. Soya Atlantic, *supra.* However, here the vessels had sighted each other and the function of a lookout was therefore *not* required. Although the Pentelikon's lookout did leave the wing of the bridge and go below for coffee, the court finds that this could not have been a proximate or contributing cause of this collision. The Victory & Plymothian, 168 U.S. 410, 429, 18 S.Ct. 149, 42 L.Ed. 519 (1897); Albatross Tanker Corp. v. S. S. Amoco Delaware, 415 F.2d 692, 694 (2d Cir. 1969); Skibs Aktieselskapet Orenor v. The Audrey, 181 F.Supp. at 703; Oliver J. Olson & Co. v. The Marine Leopard, 152 F.Supp. 197, 204 (N.D.Calif. 1957), aff'd, O. J. O. & Co. v. Luckenbach S. S. Co., 279 F.2d 662 (9th Cir. 1960), cert. denied, 364 U.S. 881, 81 S.Ct. 171, 5 L.Ed.2d 103 (1960).

■ As for the failure of the Pentelikon to utilize her radar to obtain information regarding the Verdi, prudence and good seamanship would dictate its use. See Oliver J. Olson & Co. v. The Marine Leopard, 152 F.Supp. at 206. The utility of such a major navigational aid in the prevention of collisions cannot be doubted. It can be of use not only to ascertain the presence of another vessel,

**20.** Foreign ships are not required to comply with domestic U.S. Coast Guard Regulations. See Trial Minutes, p. 590.

**21.** Rule 29.

but also to establish her course, speed and distance. The failure to utilize radar in an area of heavy traffic such as the Strait of Gibralter, when a vessel is so equipped, constitutes fault which the court finds contributed in this case to the collision. Afran Transport Co. v. The Bergechief, 274 F.2d 469, 473–475 (2d Cir. 1960); The T. J. Hooper, 60 F.2d 737 (2d Cir. 1932); Continental Oil Co. v. M. S. Glenville, 210 F.Supp. 865 (S.D.Tex. 1962). The Pentelikon failed to carry her burden of proving that the failure to utilize the radar here did not contribute to the collision. See Afran Transport Co. v. The Bergechief, 274 F.2d at 473.

The Pentelikon was thus at fault herein for not having taken affirmative action once the *in extremis* point was reached and for not having utilized her radar or in any other manner accurately ascertained the bearing course and speed of the Verdi. Since the Verdi has admitted fault and the court has found that the Pentelikon was also at fault, the damages must be divided.

■ The Verdi seeks interest and costs to the exclusion of the Pentelikon. Such an award is in the court's discretion.[22] The court finds that the usual rule for division of costs should be followed here. Likewise, any interest due Verdi should run from the date of the filing of this opinion. Of course, any computation of the amount of interest due, if any, will have to abide the event of the trial or settlement of the damages.

All motions upon which decision was reserved at trial are denied. The foregoing shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

It is ordered that both the Verdi and the Pentelikon be adjudged equally at fault for the collision; that the damages be divided accordingly; that costs be divided equally; and that the Verdi have interest on any amount due her from the date of the filing of this opinion.

A hearing may be noticed to determine the amount of damages unless a showing is made that exceptional circumstances warrant the reference to a Special Master. Fed.R.Civ.P., Rule 53(b).

Settle an appropriate order in accordance with the foregoing.

So ordered.

22. Skibs A/S Siljestad v. S.S. Mathew Luckenbach, 324 F.2d 563, 564 (2d Cir. 1963).