## CALIFORNIA AND HAWAIIAN SUGAR COMPANY

v.

## COLUMBIA STEAMSHIP COMPANY, INC., and the SS COLUMBIA BREWER.

### Civ. A. No. 70–1910.

United States District Court,
E. D. Louisiana.

Dec. 28, 1972.

Henry J. Read, A. Gordon Grant, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for plaintiff.

Walter Carroll, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for defendants.

BOYLE, District Judge:

California and Hawaiian Sugar Company, a non-profit agricultural cooperative association, brought this action in admiralty to recover for cargo loss and damage against Columbia Steamship Company and the SS COLUMBIA BREWER arising out of the stranding of the vessel in the shallow waters of Old Providence Island off the coast of Nicaragua in the early hours of June 25, 1970. Columbia Steamship Company, Inc. denied liability to cargo and asserted a counterclaim to recover cargo's share in contribution to general average.

Since the issues have been severed, this opinion treats only the question of liability.

On May 18, 1970 California and Hawaiian Sugar Company (Plaintiff) entered into a charter party agreement [1] whereby it chartered the COLUMBIA BREWER [2] from Columbia Steamship

1. Exhibit Webb # 1.

2. The charter agreement described the CO-LUMBIA BREWER as a U.S. Flag C-2 type

Company, Inc. (Defendant) for the transporting of bulk sugar from a port in Hawaii to a port on the Gulf of Mexico.[3] On or about June 7, 1970, plaintiff delivered to the defendant and to the COLUMBIA BREWER at the port of Nawiliwili, Kauai, a cargo of 11,941.395 short tons of bulk sugar. The sugar was received in apparent good order and condition for shipment and a bill of lading[4] was accordingly issued. The COLUMBIA BREWER departed Nawiliwili, Kauai, and sailed to the Panama Canal Zone without incident. On June 24, 1970, the vessel completed its transit of the Panama Canal and set a course for New Orleans. On June 25 at approximately 0628 hours the vessel stranded just off Old Providence Island in the Caribbean Sea.

After the stranding of the vessel the master attempted to back off the strand with her main engine. His attempts were unsuccessful and on June 27 he signed a Lloyd's open form salvage contract[5] and declared General Average. In the course of the ensuing salvage operations approximately 1300 tons of sugar were transferred from the COLUMBIA BREWER to the M/V PASSAT in order to lighten the stranded vessel. On July 6 the transfer of sugar to the PASSAT was completed and the COLUMBIA BREWER was refloated with the assistance of the Salvage Tug RESCUE.

Plaintiff, in seeking damages for the cargo loss resulting from the stranding, its proportion of the salvage award, fees and expenses, takes the position that it is entitled to judgment as prayed for because the stranding of the COLUMBIA BREWER—which caused the cargo loss, the salvage and General Average expenses—was due to the unseaworthiness of the vessel in the following respects: (1) the absence of Hydrographic Office (H. O.) Chart 1372; (2) the unavailability of H.O. Publication No. 20; (3) inadequate radar; (4) disconnected gyrocompass repeaters, and (5) a faulty fathometer. Defendant shipowner takes the position that the stranding was solely due to a neglect or error in navigation by the master which is an excepted peril under Section 4(2)(a) of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(2)(a). Shipowner also denies that its vessel was unseaworthy in any manner as alleged by the plaintiff and in the alternative argues that there is no causal connection between the stranding and the alleged unseaworthiness.

The Charter contained a "U.S.A. Clause Paramount"[6] under which the provisions of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1301 et seq., are incorporated in the charter party and the bill of lading issued subsequent thereto. The charter also included a "New Jason Clause"[7] which obligated

vessel built in 1945 having two decks, five holds with five hatches, engines located amidship and a fully loaded draft (summer marks) of 28′ 6⅞″.

3. Exhibit C&H #5.

4. Exhibit Webb #2.

5. Exhibit Webb #4.

6. "U.S.A. Clause Paramount. This Charter Party and any bill of lading issued hereunder shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Charter Party

or any bill of lading issuer hereunder be repugnant to said Act to any extent, such term shall be void to that extent, but no further."

7. "New Jason Clause. In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of goods shall contribute with the Owner in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

**898**

the plaintiff, as shipper, to pay salvage costs attributable to cargo as well as expenses in the nature of General Average brought about by accident or damage for which the defendant, as shipowner, is not liable.

The bill of lading evidencing delivery of the cargo to the vessel in good order together with the stipulation to the partial cargo loss [8] demonstrate that the plaintiff has carried its initial burden of proof and made out a prima facie case on its main demand. Defendant concedes that it thus has the burden of proof in bringing itself within COGSA's 4(2)(a) exception by showing that the stranding resulted from an error of navigation or management. Director General of India Supply Mission v. S.S. Maru, 459 F.2d 1370 (2nd Cir. 1972); Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426 (2nd Cir. 1962); Gilmore & Black, The Law of Admiralty 162–63, § 3–43 (1957). Plaintiff would have defendant's burden in this respect compounded by invoking the rule of The Pennsylvania, 86 U.S. 125, 22 L.Ed. 148 (1873) on the grounds that the failure to have Chart H.O. 1372 aboard the vessel and the unavailability of H.O. Publication No. 20 constitute a violation of Coast Guard Regulation 46 CFR 97.05–5.

The rule of The Pennsylvania, clearly applicable in ship collision cases, places the burden of proof upon the vessel guilty of statutory fault to show not only that such fault might not have been a cause of the collision but also that such fault could not possibly have been the cause. We need not determine whether the absence of Chart H.O. 1372 or the unavailability of H.O. Publication No. 20 is equivalent to statutory fault for we are not persuaded to apply the rule in this case. While some courts have applied the rule of The Pennsylva-

nia in other than collision cases, such cases are collected in Garner v. Cities Service Tankers Corp., 456 F.2d 476, n. 4 (5th Cir. 1972), the Fifth Circuit has yet to do so. Garner v. Cities Service Tankers Corp., supra. We agree with the finding of the Second Circuit, in a case involving the very same legal issues which are presented here, that the rule of The Pennsylvania is inapplicable where the burden of proof scheme is provided by COGSA. Director General of India Supply Mission v. S.S. Maru, supra.

Thus we shall proceed on the basis that the shipowner has the burden of bringing itself within the excepted peril of negligent navigation. Should the defendant shipowner sustain its burden, the burden would then shift to the plaintiff to establish unseaworthiness and that the unseaworthiness caused the stranding and the resulting damages. Director General of India Supply Mission v. S.S. Maru, supra; Firestone Synthetic Fibers Co. v. M/S Black Heron, 324 F.2d 835, 837 (2nd Cir. 1963); Cia. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., 274 F.Supp. 884 (D. C.M.D.1967). Should the plaintiff carry this burden, defendant could still escape liability by proving that the unseaworthiness occurred dispite its exercise of due diligence to make the ship seaworthy and to see that the ship is properly manned, equipped and supplied. Section 4(1) COGSA, 46 U.S.C. § 1304(1).

On June 24, 1970 at approximately 1118 hours the COLUMBIA BREWER departed the Panama Canal northbound on a course of 335°. Captain Webb, master of the COLUMBIA BREWER at the time of the stranding, testified that it was his intention to steer a course which would carry the vessel through the Caribbean Sea past Old Providence

---

"If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the Owner before delivery."

8. See Paragraph 7e of the amended pre-trial order.

Island, through the Yucatan Channel and from there into the Gulf of Mexico. At 1200 the vessel's course was altered to 342° and again at 2100 to 344°.

In navigating from the Panama Canal to Old Providence Island, Captain Webb consulted H.O. Chart 945 (Exhibit Webb #21 [9] ). The master testified that he intended to follow a course from the Panama Canal which would position his vessel off the southwest tip of Old Providence Island and allow him to pass about four miles to the west of the Island. (See line A–B, drawn in pencil, on Exhibit Webb 21). Webb explained that though the course actually steered, when plotted on the chart (see line A–C, in red ink, on Exhibit Webb 21), would place the vessel's approach to Old Providence Island on the southeast side, the westerly set of the waters in that area of the Caribbean would bring her to the desired position.

During the night of June 24 star sights were not available and the vessel proceeded by dead reckoning, calculating her position on the basis of her estimated speed and her direction of travel, allowing for an anticipated westerly current. On the morning of the 25th Captain Webb was on the bridge at 0330 hours, at which time a radio direction finder (RDF) bearing was taken from a station on St. Andrews Island (Line D–E on Exhibit Webb #21). Another RDF bearing from St. Andrews was taken one-half hour later, at 0400 hours (Line D–F on Exhibit Webb #21), and with the assumption that the vessel was maintaining a speed of 12½ knots, the master was able to establish the ship's approximate position (Point G on Exhibit Webb #21). Before dawn star sights were made by the second officer who had not yet made a detailed calculation of the vessel's position though he found the approximate position of the vessel from the star sights to be in conformity with the position determined on the basis of the two RDF bearings.

At 0530 hours a radar fix was obtained on the island which was then found to be slightly on the port bow at a distance of approximately fifteen to sixteen miles (Point H on Exhibit Webb #21). The master testified that because the radar fix indicated that the vessel was too far to the east of the intended position, he began steering, or conning, to the left; three course changes from the 0530 course of 344° brought the vessel to a course of 315° at 0606 hours. By then it had become light enough to see fairly well and visibility was average for approximately seven to nine miles.

Old Providence Island was first visually sighted by Captain Webb at 0606 hours, at which time the distance off by radar was ascertained to be seven miles (Point J on Exhibit Webb #21). This distance was confirmed by the visual fix which the master took by laying tangent bearings to the outer extremities of the island. At 0606 hours Captain Webb changed course to 305° and began coordinating his visual bearings with his fathometer in an attempt to locate the 100 fathom curve and navigate around the southwest end of the island. Between 0606 and 0620 hours Captain Webb frequently checked the fathometer recorder which was located in the chart room just a few paces from his position on the bridge.

At 0620 hours the master again took visual tangent bearings which placed his position just over three miles off the island (Position L on Exhibit Webb #22) [10] due south of South Hill. At

9. A substitute for the chart actually used is in evidence as Exhibit Webb #10. However, Exhibit Webb #21, which is another copy of H.O. Chart 945, was used in connection with the deposition testimony of the master and will be referred to in the course of this opinion.

10. Exhibit Webb # 22, a copy of H.O. Chart 1372, is a large scale chart covering only Old Providence Island and the waters immediately surrounding it as far out as the 100 fathom curve. This chart will be used in discussing the positions of the vessel in relation to the island from 0620 hours until the stranding.

this time the fathometer, which had a maximum range of 200 fathoms, recorded soundings of 120 fathoms for about seven minutes and then went back off soundings which, according to the master's testimony, indicated that the 100 fathom curve had not been reached. Captain Webb testified that from this position he steered further left to a course of 295°.

The master no longer consulted the fathometer but continued to navigate on a course of 295° solely on the basis of visual contact with the island. At 0628 hours the COLUMBIA BREWER, while in the process of rounding the island, ventured into waters of less depth than her draft of approxmiately 28 feet and gradually drove herself full ahead onto a shoal. Captain Webb testified that the vessel stranded at a position slightly over three miles off the southeast tip of Old Providence Island (Point K on Exhibit Webb #22).

When asked why he navigated the COLUMBIA BREWER to within three miles of Old Providence Island, Captain Webb replied that he intended to pass over the 100 fathom curve off the southwest corner of the island so that he might determine an exact point of departure which he considered essential for purposes of navigating the remaining portion of the voyage. Captain Webb stated that his navigational equipment functioned to his satisfaction and that his only explanation for the stranding was that a strong northerly current, of which he was unaware, caused his vessel to steam slightly over a mile closer to the island than he intended to pass.

Captain Webb had made the northbound run past Old Providence Island between six to eight times in the two years immediately prior to the stranding. It was his practice to pass four miles to the west of the island thereby keeping inside of southbound traffic which, according to the master, passed approximately five miles west of the island. The Hydrographic Office sailing directions (H.O. Publication 20) for a northbound course west of Old Providence Island suggest that vessels pass the island at a distance of about eleven miles.[11] These sailing directions are not binding on mariners and both Captain Ducros [12] and Captain Boyle,[13] who testified as experts at the trial, stated that it is quite acceptable to pass closer than eleven miles west of the island. While Captain Boyle stated that he had often passed four miles west of the island, Captain Ducros testified that he has only come as close as six miles in passing the island.

The sailing directions, H.O. Publication 20,[14] warn that shoals extend up to two miles offshore at the southwestern end of Old Providence Island and caution that strong and irregular currents exist in the vicinity of the island. While the master admitted that he consulted this publication on the southbound leg of the voyage, he did not consult H.O. Publication 20 on the northbound approach to the island since he knew the publication's contents and was familiar with the island and its shoals. Apparently H.O. Publication 20 had been misplaced when the chart room was painted; but it was neither sought after

11. Exhibit Webb # 25.

12. Raoul V. Ducros presently sails as a master with Lykes Brothers Steamship Company. Captain Ducros received his license, "Master, Unlimited Oceans," fifth issue, in 1947 and has continuously sailed as master on that license since the spring of 1957. Captain Ducros has had several years experience on C–2 type vessels and for the last seven years his more or less permanent run as been in the Caribbean between the Canal Zone and the Gulf of Mexico.

13. Captain Benjamin F. Boyle presently holds a master's license, "Unlimited Oceans," seventh issue. Captain Boyle has had approximately twenty-five years experience as master of oceangoing vessels and as such has navigated vessels between Panama and the Gulf of Mexico on more than fifty voyages in the general area of Old Providence Island. He last navigated past Old Providence Island in 1965.

14. Exhibit Webb # 24.

nor finally located until after the stranding.

Both Captain Boyle and Captain Ducros were called upon to give their opinion as to the navigation and course changes made by the master in approaching Old Providence Island. Captain Ducros was of the opinion that the vessel was in no immediate danger at its 0606 position of six to seven miles south of the island but that a course change to 270°, due west, would be required to pass seven miles west of the island. He considered that the course of 305°, taken by Captain Webb at 0606, would be wholly inadequate in that it would take the vessel too close to the island and the shoal. Captain Ducros described the vessel's 0620 position of three miles due south of South Hill as one of imminent danger requiring such immediate action that if the man at the wheel hesitated, he would grab it himself and make a course alteration.

Captain Boyle agreed that the vessel was in no danger at the 0606 position of six to seven miles south of the island and that he too would have steered further left, perhaps 10 to 20 degrees further left, than the course steered by Captain Webb at 0606 hours. Captain Boyle testified that if using H.O. Chart 945 he would have come to a course of about 293° or 295°, and if using H.O. Chart 1372 he would have steered either 295° or 297°. He explained that the larger scale H.O. Chart 1372 would have given him a better fix of his position from which he could steer a few less degrees to the left in order to safely pass the island without sacrificing too much distance. Captain Boyle was of the opinion that the course changes he would have made at 0606, assuming no drift or current, would have kept him outside of the 100 fathom curve approximately three and a half miles south of the island which is closer than he had ever been to the southern portion of the island. Captain Boyle considered that the vessel was not in a position of safety just three miles off the island at 0620

hours and he stated that he would have then "hauled away" to a course of at least 270° in order to clear the 100 fathom curve. It was also his opinion that at 0620 hours the vessel was in a position in which she had no business being and that a greater course change than the 295° course steered by Captain Webb was required at that time.

Captain Webb testified that when the COLUMBIA BREWER stranded at 0628 hours on the morning of June 25 visibility was average and there were a few passing showers on the horizon beyond Old Providence Island. He stated, however, that the early morning light was not bright enough for him to see the changing color of the water which would have indicated the presence of shoals, reefs or shallow water. His only explanation for the stranding was that a strong current carried the vessel in closer to the island than he had intended to navigate. Captain Boyle stated that if the fixes calculated by Captain Webb at 0606 and 0620 were correct and the courses steered by Webb were made good, the vessel should have cleared the danger. However, Boyle explained, the ship may have been further north of the positions determined by Webb at 0606 and 0620 and then encountered currents which put her even further north, thus accounting for the vessel's position (Point K on Webb # 22) at the time of the stranding.

■■ Though passing near a chartered island in order to accurately fix a vessel's position for purposes of further navigation is a recognized practice of good seamanship, said practice does not justify the actions of Captain Webb in bringing his vessel just three miles off the southwestern tip of Old Providence Island in waters he admittedly knew contained reefs and shoals. It is obvious from the testimony of Captain Webb and from that of the experts that Captain Webb navigated his vessel so close to the island as to place her in a position of danger; and once having done so, he failed to sufficiently alter

course so as to extricate the vessel from said danger. The inescapable conclusion is that the stranding of the COLUMBIA BREWER resulted from an error in navigation and management of the vessel on the part of her master, Captain Webb.

■ Yet the plaintiff argues that the stranding of the COLUMBIA BREWER was caused by the unseaworthiness of the vessel and that the defendant shipowner breached its obligation under Section 3 of COGSA, 46 U.S.C. § 1303(1)(a), and the charter party to exercise due diligence to make the vessel seaworthy and properly equipped and supplied before and at the beginning of the voyage. While seaworthiness is a comprehensive term requiring that a vessel not only be staunch and strong, but also that she be fitted out with all proper equipment in good order, it is a relative term depending on the type of voyage or the services intended. Walker v. Harris, 335 F.2d 185 (5th Cir. 1964), cert. den. 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964); Gilmore and Black, The Law of Admiralty 58 (1957).

■ We find that plaintiff's allegation concerning the unavailability of H. O. Publication No. 20, Sailing Directions for East Coasts of Central America and Mexico, fails to raise a question of the vessel's seaworthiness. The evidence revealed that Publication No. 20 was aboard the ship and regularly maintained in the chart room; however, it was placed in the chart room locker during the painting of the chart room while the vessel was in the Far East. Though some charts and publications were returned to the chart room shelves, Publication No. 20 remained in the locker. In approaching Old Providence Island, the master did not seek to consult the publication and, in fact, was unaware that it was not out on the chart room table. It was not until after the grounding that the master called for the publication and when the second officer reported that it could not be found, the master himself located it in the chart room locker.

■ Captain Boyle, testifying as an expert on behalf of the plaintiff, stated that H.O. Publication No. 20 was a necessary navigational aid to vessels operating in the area of Old Providence Island. Captain Boyle considered it the duty of a prudent master to ascertain whether such publications were aboard and that they were readily available when needed. Thus, the failure to locate H.O. Publication No. 20 reflects upon the master's management of the vessel rather than the owner's obligation to furnish a seaworthy vessel.

Also clearly without merit are the plaintiff's contentions that the vessel was unseaworthy because of several disconnected gyro-compass repeaters and inadequate radar equipment. The COLUMBIA BREWER was equipped with a Sperry gyro-compass system consisting of a master gyro-compass and seven secondary dials or gyro-repeaters all connected to the master compass. During the course of the voyage Captain Webb discovered errors developing in certain repeaters and found that these errors could be corrected by switching off those repeaters he considered unnecessary to the navigation of the vessel. The vessel proceeded from the Panama Canal to the point of stranding with only the steering repeater and the port and starboard wing repeaters connected to the master gyro-compass.

According to Captain Webb, these three repeaters were in full operation and functioned with only one degree error in the starboard repeater and a half degree error in the port repeater, which he stated was not uncommon for this equipment and did not affect his navigation. Joseph Duchesne, an expert in the field of gyro systems who examined and repaired the vessel's system subsequent to the grounding, found nothing wrong with the master gyro but found the gyro transmitter in a weakened condition which, he stated, could adversely affect the accuracy of the repeaters. Since he

had not tested the accuracy of the three connected gyro repeaters prior to repairing the transmitter, he could not testify to their condition at the time of the stranding. However, Duchesne stated that the actions of the master in disconnecting four of the seven repeaters would produce less of a strain on the transmitter and contribute to the accuracy of the three remaining repeaters.

Captain Webb testified that the four repeaters which he disconnected were merely aboard for convenience only and that none of the four were necessary for accurate navigation of the vessel. Two of the disconnected repeaters were at unmanned locations distant from the bridge and clearly would not have been used in navigation of the vessel. The third disconnected repeater was in the course recorder; it supplied information concerning the heading of the ship so that a record could be kept of the vessel's past headings. There is no evidence that the course recorder contributes to the forward navigation of the vessel; on the contrary, it merely shows what the vessel has done.[15] The other disconnected repeater was located in the RDF. Without the repeater supplying the ship's heading, RDF bearings were easily plotted by obtaining the vessel's heading from the helmsman at the time of taking the bearings. Thus, the information which would normally be supplied by the RDF's gyro-repeater was instead supplied by communication between the helmsman and the individual taking the RDF bearings. During the course of his testimony, Captain Ducros explained that he employed this method of taking RDF bearings on a recent voyage to the Far East when the gyro-repeater in his RDF equipment was rendered inoperative.

The vessel's radar, a reconditioned Raytheon Model 1500 B, was installed in

Tampa prior to the voyage, corrected in Saigon and, according to the master, functioned properly throughout the remainder of the voyage. Ronald Daigle, a technician and service manager with Raytheon, described Model 1500 B as having a ten inch scope, three centimeter wave length and a distance capability of thirty-two miles. Daigle explained that three centimeter radar equipment is specifically designed for relatively close-in operations as compared with the ten centimeter equipment which is designed for long distance operations on the high seas. Philip L. Scheurer, an experienced radar technician also employed by Raytheon, examined the vessel's radar system at the Todd Shipyard in New Orleans following the stranding. Scheurer stated that his tests revealed no malfunction in the radar equipment and that its average error of one and one-half degrees on numerous sightings was within the manufacturer's specifications as to overall bearing accuracy.

The only criticism of the vessel's radar system came from Captain Boyle who was of the opinion that Raytheon Model 1500 B was only used as a "back-up" set by large ocean going vessels. However, Daigle testified that Raytheon Company recommends that the particular radar system in question be used as primary or back-up radar on both large and small ships. Daigle voiced the opinion that 70% of all ships use a three centimeter radar system as opposed to a ten centimeter system. Daigle further stated that the Raytheon Model 1500 B, when compared with a ten centimeter set, gives better definition within twenty miles of the target.

 Without deciding whether radar itself is a required navigational aid,[16] we conclude that the radar equipment, having a distance capability of 32 miles was reasonably fit for the voyage.

15. *Accord,* Maroceano Compania Naviera, S. A. v. S.S. Verdi, 312 F.Supp. 489 (S.D.N. Y.1970).

16. Because of the result reached herein, we need not consider defendant shipowner's contention that radar is not a required navigational aid and its absence would not necessarily render a vessel unseaworthy.

A radar fix was obtained on the island when the vessel was 15 or 16 miles distant and again when 7 miles distant. Furthermore, any unseaworthy condition which might have resulted from disconnected gyro-repeaters or inadequate radar played no part in the stranding of the vessel since both the RDF bearings and the radar contact with the island were last made when the vessel was clearly in a position of safety.

■■■ Closer questions are presented by plaintiff's allegations that the failure of the fathometer to reflect the depth of the water and the absence of H.O. Chart No. 1372 rendered the COLUMBIA BREWER unseaworthy and proximately contributed to her stranding. Plaintiff claims that the fathometer's graph strongly suggests abnormal operation of that instrument in that no critical marks were recorded during the fifteen minutes immediately prior to the stranding. Plaintiff argues that had the fathometer functioned properly, the master would have been alerted to the vessel's position within the 100 fathom curve and within the vicinity of the island's reef and shoals.

The fathometer aboard the vessel was a Submarine Signal Model 896 which consists of transmitting and receiving devices located in the vessel's skin on the bottom of the ship. Sound impulses or signals are sent out through the transmitters and return from the ocean floor in the form of echoes which are picked up through the receiver and fed into an amplifier. The time interval between which the signal is sent and the echo received is measured and the depth of the water beneath the ship is thereby calculated. The depth calculations are then relayed to either an indicator, sometimes called a flasher, located on the bridge at the aft-bulkhead of the wheelhouse or to a recorder located in the chart room. The Model 896 fathometer has a maximum depth range of 200 fathoms and its electrical connections are so arranged that the recorder and the indicator cannot be operated simul-

taneously. The intensity of the emitted signal is governed by a gain control dial which must be adjusted by the operator of the fathometer according to the depth of the water. A high intensity setting of the gain control is required to get soundings near maximum depth; and as the depth of the water decreases, the intensity must be accordingly decreased in order to get an accurate reading from the fathometer.

On the morning of the stranding, Captain Webb was taking the fathometer readings from the recorder in the chart room where soundings are automatically reflected on a graph ranging from 0 to 200 fathoms. No soundings are recorded when the depth of the water is in excess of 200 fathoms. Webb testified that between 0606 and 0620 hours he frequently glanced at the recorder's graph which reflected soundings of 120 fathoms. According to Webb's interpretation of the graph (Exhibit Webb 18 and 18A), these soundings lasted for approximately seven minutes after which no further soundings were recorded. Webb stated that he did not consult the fathometer recorder after 0620 because the presence of soundings of 120 fathoms followed by the absence of soundings led him to believe that he had not yet crossed the 100 fathom curve and that he had more than 200 fathoms beneath his ship.

Leon Bordenave, an employee of International Telephone and Telegraph Company–Mackay Marine, was qualified to testify as an expert with respect to the operation and maintenance of the Submarine Signal Model 896 fathometer. Bordenave went aboard the vessel following the stranding and subsequent docking to check the fathometer and determine its operational status. He found that the fathometer appeared to be operating normally but that it received no echo or indication of the depth which he attributed to the shallowness of the water where the vessel was docked. He admitted that with a depth of five to ten fathoms beneath the ves-

sel, the fathometer's failure to receive an echo could be due to the fact that the emitting signal was so intense that the amplifier just didn't recover in time to indicate it. Bordenave further admitted that the transmitting and receiving devices, also referred to as transducers, located at the bottom of the ship are subject to being damaged in the event of a stranding or grounding which could account for a malfunction of the equipment.

Bordenave examined the graph of the fathometer recorder and stated that he could find no indication from the graph that the vessel was within 100 fathoms immediately prior to the time of the stranding which had previously been fixed by Captain Webb at point "Y" on Exhibit Webb 18A. Based on the assumption that the vessel had come within the 100 fathom curve a short time prior to the stranding, Bordenave concluded that the fathometer could not have been operating properly since no soundings were recorded. Bordenave testified that the tracings, interpreted by the master as soundings of 120 fathoms, were erroneous or stray pulses more than likely caused by an excessive setting of the gain control. Bordenave stated that excessive setting of the gain control is also manifested by a second echo or multiple readings which produce two or more lines on the graph, the second line being a multiple of the actual depth as indicated by the first line. From his examination of the graph, Bordenave found that the last reflection of the depth at which the vessel was navigating, thus a positive indication of normal operation of the fathometer, occurred when the vessel was in the vicinity of the Gulf of Panama. (So marked on Exhibit Webb 18). He admitted, however, that the fact that no depths were reflected since the vessel's departure from the Gulf of Panama did not necessarily indicate any malfunction of the fathometer. This could be explained by the fact that the vessel was in water of a greater depth than 200 fathoms

during subsequent operation of the fathometer.

As H.O. Chart 1372 clearly shows, the COLUMBIA BREWER would have had to cross the 100 fathom curve and pass through waters having depths of 5 to 15 fathoms in order to reach the point where she stranded. Philip L. Scheurer, who had previously testified concerning the vessel's radar and whose testimony with respect to the fathometer was offered in rebuttal, stated that the tracings on the fathometer graph in the vicinity of the stranding (point "Y" on Exhibit Webb 18 and 18A) indicated shallow water with a maximum depth of 9 fathoms for approximately two and one-half minutes. Scheurer's belief that these tracings were indications of water depth was based on the fact that they appeared as multiple readings with identical tracings at 9 and 18 fathoms. Scheurer also viewed the tracing at point "X" on Exhibit Webb 18A as reflecting a sudden decrease in depth to 120 fathoms followed by an increase in depth for a minute or less before the soundings of 9 fathoms near point "Y". On the basis that the tracing at point "X" was confined to the lower portion of the graph, Scheurer disagreed with the statement by Bordenave that said tracing was a stray pulse.

Scheurer was also of the opinion that the fathometer's gain control was set rather high in the area of points "X" and "Y" as evidenced by the thickness of the zero line on the graph which is caused to appear as the signal is emitted. Scheurer testified that an excessive setting of the gain control can cause shallow readings to be blanked out and that this situation is corrected by a simple adjustment of the gain control. Such an action was apparently taken at an earlier point on the graph (the area of the graph set off in red pencil as marked on Exhibit Webb 18) where soundings of 9 fathoms suddenly disappear and approximately fifteen minutes later appear again at 4 fathoms where the amount of gain appears to be de-

creased as evidenced by the thinning of the zero line. During the approach to Old Providence Island, Captain Webb had set to 9 the dial on the gain control of which a setting of 10 represents full capacity. Plaintiff relies on the testimony of Bordenave to the effect that soundings should have appeared despite such a high setting of the gain control. We note that soundings of 40 to 20 fathoms appear on previous portions of the graph where the zero line apparently reflects an excessive gain setting.

While it would seem that soundings of 100 fathoms and less should have appeared on the graph within 10 to 15 minutes prior to the stranding, in addition to the tracings which were recorded, it is not clear whether the absence of such soundings were caused by a defective condition of the fathometer or to the excessive setting of the gain control. Bordenave could not determine the operational status of the fathometer when he examined it after the stranding when the vessel was docked in shallow water. Bordenave could only state that the fathometer equipment appeared to be operating normally but that it received no echo or indication of depth which he attributed to the shallowness of the water. We find that plaintiff has failed to carry its burden in proving the COLUMBIA BREWER unseaworthy on account of its fathometer.

What is clear is that the fathometer functioned properly when used prior to the morning of the stranding. Even if plaintiff had proven that a failure of the fathometer had rendered the vessel unseaworthy, and proximately contributed to the stranding, such unseaworthiness developed after the commencement of the voyage and could not be attributable to a want of due diligence on the part of the defendant shipowner to make the ship seaworthy since the shipowner's duty is limited to "before and at the beginning of the voyage." 46 U.S.C. 1303(1).

Plaintiff's most strenuously urged contention is that the COLUMBIA BREWER was unseaworthy because she did not carry H.O. Chart 1372, the absence of which plaintiff assigns as unseaworthiness and a contributing cause of the stranding. The chart employed by Captain Webb aboard the vessel at the time of the stranding was H.O. Chart 945. Having a scale of 1:952,800, this chart covers the southwest portion of the Caribbean Sea from Panama to the coast of Honduras and is self described as being "intended for offshore navigation only." On H.O. Chart 945 the size of the drawing of Old Providence Island is about 9/16 of an inch from east to west and about 1/4 of an inch from north to south. A broken line surrounding the island represents the 100 fathom curve and gives soundings of 9 and 13 fathoms within the southwest portion of the curve. Inside of that line is a dotted line which, though not so indicated on the chart, represents the 6 fathom curve. There is no indication of the current in the vicinity of the island and only the elevation of the island at its highest point is stated.

On the other hand, H.O. Chart 1372 is of a much larger scale, 1:72,636, in which Old Providence Island, approximately 2½ inches from east to west and 4 inches from north to south, is the only land mass depicted. This chart gives numerous soundings of less than 9 fathoms within the area of the 100 fathom curve and an occasional sounding immediately outside of the 100 fathom curve. The characteristics of the island are clearly defined and elevation at various parts of the island are given. The shaded areas within the 100 fathom curve represent the shoals and reefs which extend outward from the island. Off the southwestern tip of the island within the 100 fathom curve an arrow indicates that the current runs to the northwest; and the chart also contains the notation that "[t]he current usually runs to the northwest, but it is greatly influenced by the winds."

Captain Webb testified that he had never consulted Chart 1372 in his pre-

vious voyages past Old Providence Island and that he first sought to ascertain whether his vessel carried that chart after he had stranded. Webb was of the opinion that Chart 1372 was an approach chart to the island and that it was not required for the type of voyage that he had planned. While Webb admitted that he had attempted to purchase several charts prior to this particular voyage, he could only state with certainty that it was not until after the stranding that he attempted to purchase Chart 1372. Webb explained that a reference to "the absence of one chart" in a radio message [17] sent to the defendant following the stranding was merely a reply to a request for more information concerning the stranding; [18] it is not indicative of what Webb thought caused the stranding.

Captain Boyle testified that on voyages between the Panama Canal and the Gulf of Mexico, the vessels on which he served carried both Chart 945 and Chart 1372. Boyle stated that vessels undertaking such a voyage should carry Chart 1372 since Old Providence Island lies within the major routes between Cristobal and the Yucatan Channel. When asked if he considered it *necessary* for such vessels to carry that chart, Boyle replied that it was *advisable* to have Chart 1372 because it enables one to pass close to the island and yet stay out of danger. Captain Boyle was of the opinion that Chart 1372 was not an approach chart but a coastal chart which is used for inshore, coastwise navigation where the course may be inside or immediately outside of outlying reefs and shoals. In all of Captain Boyle's experience in passing Old Providence Island, he had never passed within the 100 fathom curve and there is no evidence as to whether he had ever consulted Chart 1372.

Captain Ducros, who had navigated no closer than six miles west of Old Providence Island, considered the voyage from the Canal Zone through the Caribbean Sea to the Gulf of Mexico one of offshore navigation within the meaning of the description contained on Chart 945. In the course of his voyages through this area, Captain Ducros never had occasion to use Chart 1372 for navigational purposes and only recently had his vessels carried that chart. Captain Ducros stated that if he had intended to pass within the area depicted in Chart 1372, he certainly would have assured himself that it was on board.

▮▮▮▮ It is not disputed that proper updated charts are essential to the safe navigation of a vessel, and that a vessel without such charts is unseaworthy. Director General of India Supply Mission v. S.S. Maru, supra; The Maria, 91 F.2d 819 (4th Cir. 1937); Savannah Sugar Refining Corporation v. Atlantic Towing Co., 15 F.2d 648 (5th Cir. 1926). Given the fact that the master intended to navigate the COLUMBIA BREWER just four miles off the southwestern tip of Old Providence Island on a voyage between the Panama Canal and the Gulf of Mexico, the question is whether the navigational aids aboard the vessel were reasonably sufficient for safe navigation past the island.

The answer to this question apparently lies in a case by case approach since prior decisions facing this issue establish no rule as to the type or scale of the charts and other navigational aids required.

The Maria was found to be unseaworthy because of a failure to provide her with sailing charts and other navigational data correctly setting out the changed position of a light ship and a buoy off the shoals upon which she stranded. Neither the master nor any of the officers of the Maria had ever before sailed in the area of the stranding. The owner was not relieved of liability under the Harter Act on account of the

17. Exhibit Webb # 19M.

18. Exhibit Webb # 19P.

breach of its nondelegable duty to make its vessel seaworthy, notwithstanding the fact that the failure of the ship's master or officers to secure proper navigational data might also constitute negligent navigation or management. *The Maria*, supra.

In Trinidad Shipping & Trading Co. v. Frame, Alston & Co., 88 F. 528 (S.C. N.Y.1898) the owners of the Irrawaddy were denied a general average claim arising out of the stranding of the vessel off Nevis Island while passing the Windward Isles on a course bound for New York. The course suggested by sailing directions would not have brought the vessel within 10 miles of Nevis; the sailing directions also cautioned that the south coast of Nevis should not be approached nearer than a depth of 12 fathoms. The master was unfamiliar with these waters but was instructed to run within one-half a mile of the shore as was customarily done for the entertainment of passengers.

The only chart supplied to the vessel was a small scale blueprint chart which gave no indication of reefs and shoals in the area of the stranding. There existed, however, enlarged special charts of the Windward Isles which referred to reefs and shoals along the west side of the islands. The enlarged chart showed an irregular contour line at 3¼ fathoms about the southwest portion of Nevis apparently designating the reefs upon which the vessel stranded. The court concluded that the enlarged charts should be in the hands of every navigator of those waters and that the absence of the enlarged charts directly contributed to the stranding.

This case was distinguished in the decision of Savannah Sugar Refining Corp. v. Atlantic Towing Co., supra, where the steamship Silverway bound from Cuba to Savannah went aground on shoals off Warsaw Island. The master was navigating with a chart of the North Atlantic Ocean, western portion, which indicated the existence of shoals south of the mouth of the Savannah River near the coast between the shore and a line representing a 6 fathom curve. The claim was made that the vessel was unseaworthy for the reason that she was not supplied with United States Government charts of the waters through which a vessel would pass in approaching the mouth of the Savannah River or with sailing directions for the navigation of vessels approaching Savannah. The vessel was found seaworthy since the chart on board was enough to inform a navigator that in approaching the mouth of the Savannah River from the south the shoals along the coast can be avoided by taking soundings and not approaching the shore nearer than where the water has a depth of 6 fathoms.

There is also authority to the effect that where charts are not up to date or do not contain sufficient navigational information, the failure by the master to correct the charts or to use information otherwise available to him, such as notices to mariners, constitutes fault in navigation or management as opposed to the unseaworthiness of the vessel. Middleton & Co. (Canada), Limited v. Ocean Dominion S.S. Corp., 137 F.2d 619 (2nd Cir. 1943) ("Notices to Mariners" on board disclosed the existence and location of a wreck not so indicated by the vessel's chart); United States Products Co. v. American & Foreign Ins. Co., 82 F.2d 752 (2nd Cir. 1936) (charts and light lists could have been brought up to date by "Notices to Mariners" aboard the vessel).

In contending that Chart 945 was not reasonably sufficient for the safe navigation of the COLUMBIA BREWER, plaintiff points to three features contained in Chart 1372 which are not indicated on Chart 945. Chart 945 gives no indication of current direction in the area of Old Providence Island, while Chart 1372 shows a current running to the northwest at the southwestern end of the island and the notation of the in-

fluence of winds on the current as mentioned above. But it was Webb's opinion that a strong northerly current known only to the "locals"—inhabitants of the island—carried his vessel to the point of the stranding. Furthermore, Webb was fully aware of the sailing directions, aboard the vessel though misplaced, which warned that strong and irregular currents exist in the vicinity of the island.

Secondly, plaintiff argues that Chart 1372, the large scale chart, shows the presence of the extending shoals and the particular characteristics of the island from which more accurate tangent bearings fixing the location of the vessel could have been taken. Again the sailing directions known to the master state "at the southwestern end of the island, shoals extend up to ·2 miles offshore." Plotting of the tangent bearings taken by the master on the morning of the stranding on Chart 1372 does not support plaintiff's unseaworthiness claim. Taking the vessel's position as fixed on Chart 1372 and the course subsequently steered by the master, the vessel would have safely passed to the southwest of where she stranded. Thus, in this respect, the presence of Chart 1372 would not have avoided the casualty.

Plaintiff's final contention is that Chart 945 reflects a minimum depth of 9 fathoms, sufficient water for the navigation of the COLUMBIA BREWER, in the area of the stranding, whereas Chart 1372 reflects many soundings of lesser depths than the vessel's draft. But the evidence is that Webb was aware of the depth of the waters near the island in sight of which he navigated for some 20 minutes prior to the stranding. Within the last 8 minutes, the master did not attempt to obtain depth soundings from the fathometer recorder about which much has been said but little estab-lished. We fail to see how the numerous soundings on Chart 1372 would have kept the vessel out of where all experts agreed she had no business being.

█ The master of the COLUMBIA BREWER was familiar with the waters off the southwest shore of Old Providence Island and with the navigational data aboard the vessel which indicated the existence of the reefs, shoals and strong irregular current in that area. The master had the means of knowing the danger which the experts agree should have been avoided by getting the vessel farther from the island. The COLUMBIA BREWER was not rendered unseaworthy by the absence of Chart 1372. Savannah Suger Refining Corp. v. Atlantic Towing Co., supra.

█ We conclude from the evidence presented that the stranding of the COLUMBIA BREWER off Old Providence Island was due, not to a failure to supply the vessel with appropriate charts or to the malfunction of any of the vessel's navigational equipment, but to the failure of the master, Captain Webb, to make proper use of the information available to him and to make reasonable course corrections when he discovered that his vessel was to the southeast of the island which he intended to pass on the southwest. His error in the navigation and management of the vessel relieves the defendant shipowner from liability to the plaintiff and, together with the New Jason Clause, entitles the defendant to recover on its general average counterclaim against the plaintiff. Director General of India Supply Mission v. S.S. Maru, supra.

Judgment shall be entered accordingly.

This opinion shall serve as our findings of fact and conclusions of law.